DANNY L. JONES, APPELLANT, v. JOHNSON MACHINE AND PRESS COMPANY OF ELKHART, INDIANA, A FOREIGN CORPORATION, ET AL., APPELLEES.

320 N.W.2d 481

Filed June 4, 1982. No. 44085.

R. Steven Geshell and Robak and Geshell, for appellant.

Thomas M. Maul and Albert, Leininger & Grant, for appellees.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

McCOWN, J.

The plaintiff filed this products liability case in 1979 seeking recovery for injuries allegedly arising out of his operation of a punch press manufactured by one of the defendants in 1955. Default judgment was entered against the corporate defendant which manufactured the press. The remaining defendants other than the plaintiff's employer are corporations which succeeded the manufacturing corporation in the subsequent manufacture, distribution, and sale of the press. A special appearance was sustained as to one defendant and summary judgment in favor of the remaining defendants was entered. The plaintiff has appealed.

Plaintiff's amended petition alleges that on July 8, 1977, while working at the plant of Dale Electronics, Inc., in Columbus, Nebraska, his hand was caught in a punch press and he lost several fingers. The petition alleges that the punch press was manufactured and assembled in a defectively and unreasonably dangerous condition without warning signs or shields to prevent such an accident. It also alleged breach of implied warranty and negligent design, manufacture, assembly, sale, distribution, and installation of the punch press.

The punch press was manufactured by Johnson Machine and Press Company of Elkhart, Indiana, in 1955. In August 1956 Bontrager Corporation acquired the assets and liabilities of the Johnson company in exchange for Bontrager common stock. Johnson retained its corporate shell as a Bontrager wholly owned subsidiary but transacted no business, owned no assets but trade names, and engaged in no corporate activities. From September 1, 1956, until August 31, 1962, Bontrager manufactured presses sold under the Johnson name. The one share of Johnson stock which remained in the shell corporation was issued to Bontrager on August 20, 1962, and was by then the only share of capital stock outstanding.

On August 29, 1962, Amsted Industries Incorporated purchased all of Bontrager's assets for cash. Amsted expressly assumed certain specified liabilities of Bontrager, which did not include any liabilities for defective products. The purchase contract provided that Amsted did not assume and would not be liable for any obligations other than those expressly assumed. In addition, the contract provided that all machines sold prior to the closing date of the contract were products of Bontrager for which Bontrager alone was responsible. Bontrager and its shareholders agreed not to compete with Amsted for a period of 5 years.

On August 31, 1962, the sole share of Johnson stock outstanding in the Johnson shell corporation was transferred on the Johnson stock records from Bontrager to Amsted and a new certificate issued in Amsted's name. On the same date Amsted assigned all its rights and obligations under the purchase contract with Bontrager to South Bend Lathe, Inc., a wholly owned subsidiary of Amsted. South Bend Lathe, Inc., took possession of Bontrager's assets on September 1, 1962, and continued to manufacture presses utilizing substantially the same facility and

equipment as both Bontrager and Johnson had. The presses were sold under the Johnson trade name and Johnson continued to be merely a corporate shell.

No officer or director of Amsted was ever an officer, director, stockholder, or employee of Bontrager or Johnson, and no officer or director of Johnson or Bontrager was ever an officer or director of Amsted, prior to the 1962 sale. No officer or director of Bontrager ever became an officer or director of Amsted, although one officer of Bontrager was employed as a plant manager for approximately 4 years after the sale. Bontrager was dissolved on July 29, 1964, and its assets were distributed to its stockholders. Johnson was dissolved by Amsted on August 2, 1965, and its assets, consisting solely of trade names, were distributed to Amsted, the sole stockholder.

On September 29, 1965, South Bend Lathe, Inc., was dissolved by Amsted and its assets and liabilities transferred to Amsted, its sole shareholder. The former subsidiary was then operated as an unincorporated division of Amsted under the name of South Bend Lathe, which continued to manufacture presses sold under the Johnson trade name. In 1966 the manufacturing operations were moved from Elkhart, Indiana, to South Bend, Indiana.

In July 1975 Amsted sold the South Bend Lathe division to LWE Inc., which then changed its corporate name to South Bend Lathe, Inc., which is completely independent from Amsted. South Bend Lathe, Inc., has continued to manufacture presses in South Bend, Indiana, under the Johnson name.

On December 31, 1980, the District Court entered its order sustaining the special appearance of Bontrager Corporation. The court also found that there was no genuine issue as to any material fact, and that the motions for summary judgment of Amsted Industries Incorporated and South Bend Lathe, Inc., should be sustained, and that they were enti-

tled to judgment as a matter of law. The plaintiff has appealed from that order.

The plaintiff contends that in a products liability case where a corporation acquires all, or substantially all, of the assets of its predecessor corporation for cash and continues essentially the same manufacturing operation as the predecessor corporation, the successor corporation remains liable for the products liability claims of its predecessor.

This is a case of first impression in this state. Most courts which have addressed the issue have treated the problem as one of corporate law rather than as a special segment of products liability cases. The long-established general rule is that a corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation. There are four well-recognized exceptions to the general rule under which liability may be imposed on a purchasing corporation: (1) When the purchasing corporation expressly or impliedly agreed to assume the selling corporation's liability; (2) When the transaction amounts to a consolidation or merger of the purchaser and seller corporations; (3) When the purchaser corporation is merely a continuation of the seller corporation; or (4) When the transaction is entered into fraudulently to escape liability for such obligations. See, W. Fletcher, Cyclopedia of the Law of Private Corporations §§ 7122 and 7123 (rev. perm. ed. 1973 and Supp. 1981); *Leannais v. Cincinnati, Inc.,* 565 F.2d 437 (7th Cir. 1977); *Hernandez v. Johnson Press Corp.,* 70 Ill. App. 3d 664, 388 N.E.2d 778 (1979).

In the case at bar the corporations in whose favor summary judgment has been entered do not fit any of the exceptions to the general rule. Under traditional rules plaintiff's claim of liability would be denied unless the facts established the existence of one of the four exceptions. See *Johnson v. Marshall & Huschart Machinery,* 66 Ill. App. 3d 766, 384 N.E.2d 141 (1978).

Recently some courts have developed and applied a theory in products liability cases which imposes liability on successor corporations without regard to the "niceties" of corporate transfers where the successor acquires and continues the predecessor's business in an essentially unchanged manner. See *Ramirez v. Amsted Industries, Inc.,* 171 N.J. Super. 261, 408 A.2d 818 (1979). Such cases justify the abandonment of traditional corporate analysis on the basis of the stated social desirability of placing the risk of defective products on the marketing enterprise which manufactured and sold them. Various theories have been adopted to expand the focus of legal liability. Some courts have looked to the nature and consequences of the transaction and found a de facto merger for product liability purposes even though the formal characteristics of a corporate merger were not present. See *Shannon v. Samuel Langston Company,* 379 F. Supp. 797 (W.D. Mich. 1974).

Other courts have relied on a continuity of the enterprise theory. See *Turner v. Bituminous Casualty Co.,* 397 Mich. 406, 244 N.W.2d 873 (1976).

Still other courts have abandoned the traditional approach and have evolved a new exception called the product-line exception. See, *Ray v. Alad Corp.,* 19 Cal. 3d 22, 560 P.2d 3, 136 Cal. Rptr. 574 (1977); *Dawejko v. Jorgensen Steel Co.,* ____ Pa. Super. ____, 434 A.2d 106 (1981).

Under the facts in the present case we find no basic justification for a departure from the traditional rules. The public policy considerations which motivate imposition of strict liability on those who create risk and obtain profit by placing defective products in the stream of commerce do not necessarily apply equally to successor corporations. To paraphrase the language of several courts, the corporate assets purchaser, as a successor of the manufacturer of a defective product, cannot be said to

have created the risk of a product manufactured by its predecessor, and, except in a very remote way, does not realize the profit for the sale of a predecessor's product. Generally speaking, the successor corporation has neither invited use of its predecessor's product nor represented to the public that that product is safe and suitable for use.

Obviously, a corporation is subject to liability for defective products which it manufactures and sells itself, regardless of whether it is a predecessor or successor corporation. The passage of time involved in the present case, and the multiple corporate successors, accentuates the problems of altering or expanding traditional rules of corporate law in the area of strict liability in tort.

Ordinarily, strict liability for defective products has not been imposed upon a defendant corporation without some responsibility for having created or perpetuated the defect. The question of whether or not strict liability in tort policy should be substantially altered by also changing established principles of corporate succession transactions involves broad public policy issues which are more appropriately left to legislative determination.

In view of our disposition of the major issue involved, it is unnecessary to discuss the remaining assignments of error.

The judgment of the District Court is affirmed.

AFFIRMED.