JOHN B. TIMMERMAN, APPELLANT, V. AMERICAN TRENCHER, INC., ET AL., APPELLEES.

368 N.W.2d 502

Filed June 7, 1985.   No. 84-346.

Thomas A. Grennan and Larry E. Welch of Gross, Welch, Vinardi, Kauffman & Day, P.C., for appellant.

William M. Lamson and Joni R. Kerr of Kennedy, Holland, DeLacy & Svoboda, for appellees.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

CAPORALE, J.

Appellee American Trencher, Inc., purchased the assets of and assumed a certain liability of Bradco, Inc. Appellant, John B. Timmerman, filed suit against American Trencher and others, alleging he was injured by a defectively designed and unreasonably dangerous drophammer manufactured by Bradco. The trial court sustained American Trencher's motion for summary judgment. In this appeal Timmerman urges the trial court erred in concluding that American Trencher was entitled to judgment as a matter of law. He argues that the facts support an inference that American Trencher is a continuation of the corporate entity of Bradco. We agree with Timmerman and therefore reverse and remand for further proceedings.

Both Timmerman and American Trencher acknowledge that the controlling rule of substantive law is set forth in *Jones v. Johnson Machine & Press Co.*, 211 Neb. 724, 320 N.W.2d 481 (1982), also a products liability action. Therein, various corporations succeeded to the corporation which had manufactured the allegedly defective product. In affirming the trial court's summary judgment dismissing the action against the successor corporations, we adopted the rule that a corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation unless (1) the purchasing corporation expressly or impliedly agreed to assume the selling corporation's liability; (2) the transaction amounts to a consolidation or merger of the purchasing and selling corporations; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction has been entered into fraudulently to escape liability for the obligations of the selling corporation.

There is no dispute as to any material fact relating to the arrangement leading to the creation of American Trencher. The ultimate inference to be drawn from those facts is, however, another matter.

Bradco was incorporated in Iowa in 1964 and did business at Delhi, Iowa, a small community of about 500 residents. It was dissolved in 1976, after the sale of its assets on March 31, 1976, for failure to file its 1976 annual report.

The Schnittjer brothers, Bradley and Roger, were, together, either the majority shareholders or virtually so from the time of Bradco's incorporation to the time of its dissolution. At that time Roger and Bradley owned approximately 46 percent of Bradco's capital stock; they and other Schnittjer family members owned a combined total of 73 percent. At one time or another a total of approximately 40 people owned stock in Bradco, but most owned a very small amount, usually less than 1 percent, and a substantial number of these shareholders were either relatives of the Schnittjers or residents of Delhi.

The final officers of Bradco were Bradley, president, Patrick Lenane, secretary, and Mary Nefzger, temporary secretary. Roger had been the vice president until August of 1975, when he resigned in an effort to save money. Bradley served as Bradco's engineer, and both Schnittjer brothers were involved in Bradco's day-to-day operations.

Roger was Bradco's lone director at the time Bradco's assets were sold. Russell Schnittjer and the other director, Richard Sutton, had resigned as such approximately 3 weeks earlier.

In the mid-1970s Bradco began to experience financial difficulties. At that time it had a number of unsecured creditors and two secured creditors, the Delhi Savings Bank and the Iowa Business Development Credit Corporation. The bank was sold under conditions whereby its sellers retained the loan. The fact that this loan was retained by the sellers of the bank has no legal significance to the issue before us, and we therefore refer to this loan as if it continued to be owned by the bank. Each secured loan was delinquent, and the secured creditors demanded that Bradco pay the delinquent loans in full. As a consequence, it became impracticable for Bradco to continue operating, since substantially all of its assets served as collateral for these two loans.

Bradley and a financial consultant-"venture capitalist" began exploring alternatives to save the business. Any thought of reorganizing under the federal bankruptcy law was rejected

because there was not enough money to even pay legal expenses. Since there were no other viable alternatives, either the consultant-capitalist or Bradley, or both, contacted the credit corporation about the possibility of its extending credit to a new venture which would be formed to manufacture the same product line as manufactured by Bradco. The credit corporation agreed to extend credit to such a venture under certain conditions, including an infusion of capital to pay off the bank loan.

In accordance with this agreement American Trencher was then incorporated on March 15, 1976. On March 17, 1976, Bradley and Roger met as the sole members of the board of directors of American Trencher and authorized American Trencher to bid on the assets of Bradco.

On March 18, 1976, Bradley, as Bradco's president, signed an agreement appointing the credit corporation as trustee and receiver of Bradco, thereby allowing the credit corporation to take possession of all the property listed in its security agreement without any judicial action and to also manage or sell such property. The single attorney acting for both Bradco and American Trencher testified that to do otherwise would merely postpone the inevitable, there being no question about the enforceability of the two secured loans.

Bradco's assets were then sold at a public auction held on March 31, 1976, in Delhi, Iowa. At least 50 people attended the auction, which had been advertised in numerous newspapers, but American Trencher was the only bidder. The Bradco trademark was one of the assets serving as collateral for the credit corporation's loan and one of the assets American Trencher acquired and continues to use on its letterhead.

Bradley then executed an assumption agreement, as president of American Trencher, binding that corporation to payment of the credit corporation loan. Capital contributed by an uncle of the Schnittjer brothers was used to pay off the bank loan. Bradley, Roger, and one of their sisters, Marilyn Schnittjer, as personal guarantors, and Bradco as a corporate entity, signed forms consenting to the assumption by American Trencher. Bradley, Roger, and Marilyn also signed a small business administration guarantee "[i]n order to induce IOWA

BUSINESS DEVELOPMENT CREDIT CORPORATION . . . to consent to the assumption . . . by American Trencher." In addition, Bradley and Roger signed a security agreement listing American Trencher as the debtor.

By April 22, 1976, American Trencher had issued 10,000 shares of stock, 7,000 of which were acquired by members of the Schnittjer family. Bradley and Roger each acquired 2,750 shares for their past service. They paid no cash. Their mother, Agnes Schnittjer, acquired 1,500 shares. The other four shareholders included the consultant-capitalist, who initially acquired 1,000 shares and later acquired an additional 150 shares each from Bradley and Roger.

Elected as officers of American Trencher at an April 6, 1976, meeting were Bradley, president and treasurer, Roger, vice president and secretary, and Robert Downer, assistant secretary. Patrick Lenane, who had served as Bradco's sales manager as well as its secretary, did not continue with American Trencher because there was not sufficient money. Bradley became American Trencher's engineer, as he had been with Bradco.

Although American Trencher had renegotiated with every one of its employees and dealers, on the first day of American Trencher's operations every one of its employees had formerly been employed by Bradco. There was but a day or two work stoppage between the time Bradco ceased and American Trencher began operations. Approximately 90 to 95 percent of Bradco's dealers continued to serve American Trencher.

American Trencher did not honor Bradco's warranties, but parts for Bradco's products were stocked. In fact, at least in the beginning, American Trencher's product line was identical to that of Bradco. American Trencher has continued to manufacture the drophammer which is the subject of this suit, and has also continued to use the Bradco trademark on the drophammer, as well as most other items manufactured previously by Bradco.

American Trencher correctly argues that the fact that it may be continuing the business operations of Bradco does not, in and of itself, establish that American Trencher is a continuation of Bradco's corporate entity. *Jones v. Johnson Machine & Press*

*Co.*, 211 Neb. 724, 320 N.W.2d 481 (1982). As put by *Armour-Dial, Inc. v. Alkar Engineering Corp.*, 469 F. Supp. 1198, 1201 (E.D. Wis. 1979): "The mere fact that the purchaser continues the operations of the seller does not of itself render the purchaser liable for the obligations of the seller; in order to impose liability on the purchaser, it must be shown that the purchaser represents 'merely a "new hat" for the seller.' "

*Jones v. Johnson Machine & Press Co., supra*, does not undertake to analyze the factors to be considered in determining whether the purchasing corporation is the continuation of the corporate entity of the selling corporation. However, *Douglas Printing Co. v. Over*, 69 Neb. 320, 95 N.W. 656 (1903), provides insight as to the factors to be considered. Douglas Printing Company had three shareholders, each of whom owned one-third of its capital stock. It was not prospering financially, and many of its assets were mortgaged to Carpenter Paper Company. Two of the stockholders decided to transfer all their stock to one of their number, John Douglas. John Douglas then turned over all the printing company's capital stock to the paper company. The paper company then turned over the printing company's assets to a newly formed corporation, Douglas-Watters Company, which in turn gave the paper company a mortgage equal in amount to the paper company's claim against the printing company. The mortgage on the printing company's assets was then released. For a monetary consideration the printing company conveyed all its other assets, including good will, to the Douglas-Watters Company. John Douglas, who was the "leading spirit" of both the printing company and the Douglas-Watters Company, and two Watters brothers became the shareholders of the latter company. It was held that the Douglas-Watters Company was a mere continuation of the Douglas Printing Company and that the former was therefore liable for the printing company's debts. A judgment against the Douglas-Watters Company in favor of a judgment creditor of the printing company was therefore affirmed.

Cases from other jurisdictions follow the same approach and hold that a commonality of officers, directors, or stockholders is an important consideration in determining whether a

purchasing corporation is but a continuation of the corporate entity of a selling corporation. *Leannais v. Cincinnati, Inc.*, 565 F.2d 437 (7th Cir. 1977); *Travis v. Harris Corp.*, 565 F.2d 443 (7th Cir. 1977); *Armour-Dial, Inc. v. Alkar Engineering Corp., supra; Weaver v. Nash Intern., Inc.*, 562 F. Supp. 860 (S.D. Iowa 1983), *aff'd* 730 F.2d 547 (8th Cir. 1984).

The present case is analogous to *Douglas Printing Co.* in that there was commonality of both ownership and leadership between the selling and purchasing corporations, and in that creation of the purchasing corporation simply became a means of refinancing a major secured debt of the selling corporation. Such was not the situation in *Jones v. Johnson Machine & Press Co., supra*. In *Jones* no officer or director of the ultimate purchasing corporation was ever an officer, director, stockholder, or employee of the intermediate purchasing corporation or of the manufacturing corporation, and no officer of either the manufacturing corporation or intermediate purchasing corporation was an officer or director of the ultimate purchasing corporation prior to the latter's purchase. *Jones*, then, represents the factual antithesis of the present case.

American Trencher further argues that it cannot be considered a continuation of the corporate entity of Bradco because American Trencher in reality came into existence involuntarily as the result of the actions of Bradco's creditors. That is to say, there was an involuntary reorganization forced upon Bradco by its secured creditors.

There appears to be authority for American Trencher's position that an involuntary reorganization forced upon a corporation by its creditors ordinarily leaves the unsecured creditors of the predecessor corporation without recourse against the successor corporation. 15 W. Fletcher, Cyclopedia of the Law of Private Corporations §§ 7327-7329 (rev. perm. ed. 1983).

The reasoning of *People ex rel. Donahue v. Perkins & Will*, 90 Ill. App. 3d 349, 413 N.E.2d 29 (1980), cited by American Trencher in support of the above proposition, is, however, instructive. Therein, the State of Illinois filed suit against several defendants, alleging numerous defects in the construction of a building. In the early 1970s, about the same

time defective windows were installed by T-O-W Industries, T-O-W began experiencing financial difficulties. T-O-W obtained a substantial loan from a group of six lenders in exchange for which the lenders received a security interest in all of T-O-W's assets. As part of this transaction, one Wright, T-O-W's president and sole shareholder, put his T-O-W stock in a voting trust, which enabled the lenders to have voting control of the corporation. In 1975 T-O-W became insolvent, and the six lenders then used their voting power to elect their own representatives as directors of T-O-W. A new president and controller, not employees of the lenders, were hired. When it became apparent that T-O-W would fold, the lenders, using their voting power, caused T-O-W's assets to be transferred to an assignee for the benefit of creditors. This assignee was independent of the lenders. The six lenders then developed a plan to form a new corporation, Temp-Tech Industries, Inc., which would acquire T-O-W's assets and pay off the loan. The assignee then sold all of T-O-W's assets, subject to the security interest, to Temp-Tech. Temp-Tech then began operating in the same facilities and made the same products as T-O-W had previously made. Temp-Tech's initial shareholders were the six lenders, and its board of directors were the individuals who had represented the lenders on T-O-W's board. After this transaction T-O-W's charter was revoked for failure to pay the franchise tax. Temp-Tech made payments to T-O-W's secured creditors, but the unsecured creditors were left unpaid. The court determined that the lenders' action of assigning T-O-W's assets for the benefit of creditors was the functional equivalent of foreclosure and represented an involuntary reorganization. After citing the four traditional exceptions to the general rule of nonliability, the reviewing court found that none were applicable and affirmed the dismissal of Temp-Tech as a defendant.

As can readily be observed from comparing the facts of *Perkins & Will* to the facts of the present case, the two appear very similar. There is, however, an important factual difference. In *Perkins & Will* there was no continuity of shareholders. Wright was T-O-W's sole shareholder, and the six lenders were Temp-Tech's initial shareholders. It was the lack of

a commonality of ownership, not the fact there was an involuntary reorganization, which served as the basis for rejecting the argument that Temp-Tech was a mere continuation of T-O-W. In the words of the court, "plaintiff's arguments for 'mere continuation' are not compelling without a finding that the equitable owners of the new corporation had an ownership interest in the [predecessor] corporation." 90 Ill. App. 3d at 354, 413 N.E.2d at 33.

Given the commonality of ownership and leadership between Bradco and American Trencher, it cannot be said the undisputed facts do not support at least an inference that American Trencher is but a continuation of the corporate entity of Bradco.

A summary judgment does not lie where the ultimate inferences to be drawn from material facts as to which there is no genuine issue are not clear. *City Bank & Trust Co. v. Van Andel, ante* p. 152, 368 N.W.2d 789 (1985); *Yankton Prod. Credit Assn. v. Larsen,* 219 Neb. 610, 365 N.W.2d 430 (1985); *De Los Santos v. Great Western Sugar Co.*, 217 Neb. 282, 348 N.W.2d 842 (1984).

Accordingly, the judgment of the district court is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.