GEORGE EARL, APPELLANT AND CROSS-APPELLEE, V. PRIORITY KEY
SERVICES, INC., AND PRIORITY DATA SYSTEMS, INC., APPELLEES
AND CROSS-APPELLANTS.
441 N.W.2d 610

Filed June 23, 1989.   No. 87-136.

Richard S. McMillin, of Marks & Clare, for appellant.

Michael O. Johanns and Lavern R. Holdeman, of Peterson Nelson Johanns Morris & Holdeman, for appellees.

HASTINGS, C.J., GRANT, and FAHRNBRUCH, JJ., and HENDRIX and OLBERDING, D. JJ.

OLBERDING, D.J.

George Earl appeals an order of the district court for Douglas County finding Priority Data Systems, Inc. (Priority), was not a successor corporation to Priority Key Services, Inc. (Key). Priority and Key cross-appeal the dismissal of their counterclaims against Earl for rescission of the contract for the sale of American Key Data, Inc. (American), and damages based on misrepresentation. We affirm the dismissal of the counterclaims, but reverse the finding as to Priority's liability and remand for entry of judgment against it.

## FACTS

The appellant, Earl, contracted with Paul Pettinger and Marcella Haas to sell his data entry business, American, to a new corporation to be formed and named Priority Key Services, Inc. The trade name of "American Key Data" and the customer list were the primary assets of American.

The following were the essential provisions of the agreement for the sale of assets, consulting agreement, and stock purchase agreement completed on July 20, 1982: (1) Purchase price of $60,000 was to be paid: (a) $20,000 at closing, and (b) $40,000 in 60 installments of $889.78, which included interest at 12 percent; (2) stock of the new corporation, Key, was to be owned: (a) 25 percent by Earl, and (b) 75 percent by MPX

Management Systems (Management), owned primarily by Pettinger and Haas; (3) Key could repurchase Earl's 25 percent stock after 18 months; and (4) Earl was to receive commissions on gross income of Key as follows: (a) 5 percent up to $200,000, (b) 3 percent between $200,000 and $400,000, and (c) 1½ percent over $400,000. Gross income included all jobs for which over 60 percent data entry service was invoiced by Key or Priority, owned by Management. Invoicing was done by Priority.

Key ceased making payments under the consulting agreement in October 1983. Invoicing under the consulting agreement ceased in March 1984. Only 16 of the 60 monthly installment payments on the sales agreement were made. Key exercised its option to purchase Earl's stock in January 1984.

Key attempted to buy Earl's contractual interest for $7,500 or to return the business to him, but Earl refused the offer. Pettinger, one of the controlling stockholders in and an officer of Priority, told Earl that if Key closed its doors, Priority would not turn away former Key customers.

In April 1984, Key decided to cease operations due to a poor financial condition.

Key and Priority sent letters to Key customers telling them that Key and Priority had merged effective May 1, 1984. The letters stated they were in the same building; with the same box number, same employees, and same excellent service; but with a different name.

At the time of the trial, Key was no longer doing any business and owned only minimal assets. Priority was serving all former customers of Key who had requested data entry services.

Earl sued Key for breaching the agreement for the sale of assets and the consulting agreement. He also sued Priority on the theories of equitable assignment, successorship liability, fraudulent conveyance, unjust enrichment, and merger by estoppel. Key and Priority counterclaimed for rescission of the contracts based on fraudulent misrepresentation.

At trial, John Cederberg of Touche Ross testified his audit of Key from July 20, 1982, to March 31, 1985, revealed: (1) Key and Priority always did business as two separate and distinct companies, and (2) Key had a net operating loss for the period

of $118,013, based on total revenues of $114,918 and expenses of $232,931.

After the bench trial, the district court for Douglas County entered judgment against Key on the breach of contract claims. Neither party appeals this finding. The court found Priority was not liable on any of the equitable theories and dismissed Earl's claim against Priority. The court also found insufficient proof of fraudulent misrepresentation by Earl and dismissed the counterclaims.

## STANDARD OF REVIEW

On appeal to this court, an equity action is tried de novo on the record, requiring this court to reach a conclusion independent of the findings of the trial court, but subject to the rule that where credible evidence is in conflict on material issues of fact, we will consider the fact that the trial court observed the witnesses and accepted one version of the facts over another. *Selection Research, Inc. v. Murman*, 230 Neb. 786, 433 N.W.2d 526 (1989).

On appeal, Earl advances four theories under which he claims Priority is liable: (1) corporate successor liability, (2) equitable assignment, (3) contractual successor liability, and (4) unjust enrichment. Because we find Priority is liable as a successor corporation, we do not reach the other theories.

## CORPORATE SUCCESSOR LIABILITY

In *Jones v. Johnson Machine & Press Co.*, 211 Neb. 724, 320 N.W.2d 481 (1982), this court ruled a corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation unless

> (1) . . . the purchasing corporation expressly or impliedly agreed to assume the selling corporation's liability; (2) . . . the transaction amounts to a consolidation or merger of the purchaser and seller corporations; (3) . . . the purchaser corporation is merely a continuation of the seller corporation; or (4) . . . the transaction is entered into fraudulently to escape liability for such obligations.

*Id.* at 728, 320 N.W.2d at 483. See, also, *Timmerman v. American Trencher, Inc.*, 220 Neb. 175, 368 N.W.2d 502 (1985).

Although Priority did not purchase the assets of Key for

cash, we find the *Jones* rule applies in this instance as well. The record reveals that at the time it ceased operations, Key's liabilities were in excess of $110,000. Of this amount, almost $70,000 was owed to either Priority or Management in advances made for operation expenses or in unpaid management fees. The remainder was the amount owed to Earl for the original sales contract, the stock redemption note, and attorney fee advances. In effect, this transaction amounted to a cancellation of Priority's advances to Key in return for Key's business. As such, it is a transfer of business for a valuable consideration, which properly falls within the *Jones* rule.

In this particular case, several factors lead us to conclude Priority should be held liable for Key's breach of contract with Earl. First, Priority and Key described the transaction as a merger. On April 17, 1984, Key sent letters to its customers claiming it was merging with Priority.

> We want to take this opportunity to thank you for your past business. It isn't often that we take time to say "thank you" to the people who keep us in business.
>
> In order to keep you abreast of our corporate changes, we'd like to inform you of a name change. *We are merging with PRIORITY Data Systems, Inc.*, effective May 1, 1984. From now on you will receive correspondence under that name.
>
> *We are in the same building with the same box number, same employees and same excellent service — just a different name.*

(Emphasis supplied.)

Haas, president of Priority, sent a memorandum addressed to "All PRIORITY and AKD [Key] Employees," dated April 18, 1984.

> In order to keep you abreast of our corporate changes, we would like to inform you of a name change. *American Key Data and PRIORITY Data Systems, Inc. are merging* effective May 1, 1984.
>
> *The operation of the new merged business will be no different.* You will still have two time cards. One for PRIORITY and one for Key Services. The 592-2020 line will be answered "Key Services".

(Emphasis supplied.) These letters and memoranda were clearly intended to give customers and employees the impression no substantial change had taken place.

Further, as is clearly stated in both the letter and the memorandum, Priority provided the same service, at the same address, to the same customers, using the same employees, and in some respects, such as answering the phone and dealing with employee timecards, using the same name. Following the transaction, Priority continued the business which Key had previously been engaged in, and Key virtually went out of existence.

Also, the structure of the transaction supports a finding that its purpose was to avoid Key's obligation to Earl. Following the transaction, Key was left with virtually no assets with which to pay its remaining creditors, which consisted of its related corporations and Earl.

Lastly, Key and Priority were owned by Management, with Haas and Pettinger controlling both corporations. This fact lends further support to the conclusion that Priority was a mere continuation of Key.

Based on the foregoing, we find Priority merely continued Key's business under a new name. As such, Priority is liable for Key's obligation to Earl. *Armour-Dial, Inc. v. Alkar Engineering Corp.*, 469 F. Supp. 1198 (E.D. Wis. 1979).

## COUNTERCLAIMS

The counterclaims of Priority and Key present the issue of whether fraudulent misrepresentations were made by Earl prior to the contracts' being signed.

This court has held that the elements of fraudulent misrepresentation are as follows: (1) A representation was made; (2) the representation was false; (3) when the representation was made, it was known to be false or was made recklessly without knowledge of its truth and as a positive assertion; (4) the representation was made with the intention that it would be relied upon; (5) there was reliance upon the representation; and (6) damages occurred as a result. *Bock v. Bank of Bellevue*, 230 Neb. 908, 434 N.W.2d 310 (1989); *Nielsen v. Adams*, 223 Neb. 262, 388 N.W.2d 840 (1986).

Both Haas and Pettinger were educated business people. Pettinger, a certified public accountant, had previously sold a data entry business. Haas had been in the data processing business for over 5 years. They both knew that Earl's business was declining due to his other outside interests. They got what they expected, a data entry business with gross annual sales in previous years of between $200,000 to $400,000. They, not Earl, were in control of, and responsible for, any lack of sales after the contracts were signed. Having reviewed the record, we find that no material false representations were made.

## ORDER ON REMAND

The judgment dismissing Earl's second amended petition as to Priority is reversed, and the matter is remanded to the trial court for entry of judgment against both Key and Priority on the sale of assets contract and consulting agreement. The judgment dismissing the counterclaims of Key and Priority is affirmed.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTION.