ANTHONY ABBOUD AND ROBERT DOYLE, APPELLANTS, V. FORREST
R. MICHALS, JR., AND TWIN TOWERS, LTD., A NEBRASKA LIMITED
PARTNERSHIP, APPELLEES.

491 N.W.2d 34

Filed October 23, 1992.    No. S-89-700.

Alan M. Thelen and Kelle J. Westland, of Westland &
Associates, P.C., for appellants.

748

Peter C. Wegman, of Rembolt Ludtke Parker & Berger, for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

GRANT, J.

Plaintiffs, Anthony Abboud and Robert Doyle, appeal from an order of the district court for Douglas County. The order granted summary judgment to defendants, Forrest R. Michals, Jr., and Twin Towers, Ltd., a Nebraska limited partnership, in plaintiffs' suit for damages to recover a real estate commission for the sale of Twin Towers, a condominium in Omaha, Nebraska. This case marks the second appearance of plaintiffs in this court on the issue of payment of real estate commission on the sale of Twin Towers. The first case resulted in a judgment in favor of the buyer of the property on the issue of the payment of a commission to plaintiffs. See *Abboud v. Cutler*, 238 Neb. 177, 469 N.W.2d 763 (1991). This action is directed against the sellers of the property.

Plaintiffs timely appealed from the summary judgment and in this court assign as error the actions of the district court in (1) "entering summary judgment against [plaintiffs] as to the theory of recovery of breach of contract" and (2) entering summary judgment even though plaintiffs' seventh amended petition "pleads the requisite elements of fraud, and that the evidence on the record creates material factual issues." Brief for appellants at 24. We affirm.

The record before us consists of the pleadings, depositions, and affidavits and shows the facts set out below. On November 8, 1982, plaintiffs, who are licensed real estate agents and brokers, prepared and submitted to defendants a nonexclusive listing agreement for the sale of Twin Towers. The proposal provided that the selling price would be $5.5 million and provided that the seller would pay a commission of $250,000 if a sale was made or a buyer was found. This original nonexclusive listing proposal was not agreed to by defendants. Instead, Michals changed the language of the proposal to provide that the selling price for Twin Towers would be $5.25 million, and made no provision for the payment of a

commission by the sellers. At the bottom of the document, Abboud wrote: "COMMISSON [sic] OF 250,000 TO BE PAID BY BUYER." This agreement was signed by Michals as "General Partner" and owner and by Abboud as a representative of Gateway Realty of Omaha. Gateway assigned its interest to plaintiffs. On November 8, 1982, when the agreement was signed, plaintiffs had no prospects to buy Twin Towers and did not know of Michael Cutler, the eventual buyer.

Pursuant to the November 8 agreement, plaintiffs began efforts to sell the property. They placed an ad in the Exchange Journal and sent out information to various parties. They also prepared, from information supplied by Michals, materials showing the income and expenses of Twin Towers.

Plaintiffs testified that they delivered to Michals a one-party listing agreement naming Cutler as their client. Plaintiffs contend that the document required Michals to ensure that if Cutler purchased the property, plaintiffs would get a commission. Plaintiffs concede that this document was never signed, and no copy of it is before this court.

An agreement dated June 2, 1983, was executed by Michals and given to the plaintiffs. The agreement provided that in consideration of plaintiffs' presentation of Cutler and in further consideration of their "willingness to make all commission arrangements exclusively with the said Mike Cutler," Michals agreed not to "solicit, show or in any way attempt to sell" Twin Towers to Cutler for a period of 1 year. This agreement was signed by Michals and plaintiffs.

Cutler called plaintiffs in response to the advertisements placed by plaintiffs. Cutler was sent information on Twin Towers. Plaintiffs testified that they showed the property to Cutler sometime in May or June 1983, but were unsure if this first meeting took place before or after the June 2 agreement. Michals was present for the first tour of the Towers building at the plaintiffs' invitation and answered questions from Cutler. After this first meeting, plaintiffs discussed with Cutler possible uses for the property, the price, and the buyer's responsibility for the real estate commission. Abboud testified that Cutler had no objection to paying the commission.

Cutler visited the property several more times in 1983, both

with and in the absence of the plaintiffs. Abboud testified that he never told Cutler not to go through the building without the plaintiffs, nor did he instruct Cutler to speak to plaintiffs rather than to Michals about the property.

Abboud testified that he was not aware of any specific instances in which Cutler and Michals discussed the property without the plaintiffs being present, but was sure that they had done so. He made no complaints, however, about the direct contacts, nor did he complain about the showings, solicitations, or attempts to sell by Michals.

In July 1983, plaintiffs supplied Cutler with a commission proposal which stated that Cutler agreed to pay $250,000 in commissions to plaintiffs if he purchased Twin Towers. Cutler never signed this agreement.

The first draft of the proposed sale agreement between defendants and Cutler, dated July 8, 1983, listed the sale price as $5 million but contained nothing about the payment of a commission.

In a letter dated August 5, 1983, Michals made a counteroffer to Cutler. His letter contained the following proposed term:

> 5. Broker's Commissions. We understand that you have been dealing with certain real estate agents, specifically Bob Doyle and Tony Abboud, concerning your possible purchase of the property. In the event that a commission becomes due and owing to these individuals, or any other individual with whom you have dealt, you will be solely responsible for any such commission and we will not be required to pay any of the same.

The letter was signed by Michals, and Cutler signed it after the language "AGREED AND ACCEPTED."

Abboud testified that he did not attempt to prevent any of the parties from signing these documents. He made no further attempts to get Cutler to sign a written commission agreement.

On November 18, 1983, a final purchase agreement was entered into by Michals as the sole general partner of Twin Towers, Ltd., and by Cutler. The purchase price was $5 million, and the agreement contained the following clause:

> Real Estate Commissions. The parties acknowledge there

is no listing or brokerage contract relating to the Property. Buyers represent that any lawful commission determined to be due and owing will be the sole obligation of Buyers and will not become a lien on the Property or an obligation of Seller. . . . Seller and Buyers each represent and warrant to the other that no other persons are entitled to any real estate commission as a result of the sale of the Property and each party hereto agrees to indemnify the other and hold it harmless from and against any obligations to pay any such real estate commissions. This provision is solely between Seller and Buyers and shall in no manner be construed to establish a right by any third party to receive a real estate commission upon a sale of the Property.

The agreement was signed by both Cutler and Michals and was notarized.

Plaintiffs were not paid by Cutler. They are now making a claim against Michals based on the above-mentioned June 2 agreement, asserting that the agreement required Michals to "protect" the plaintiffs' commission arrangements with Cutler. Plaintiffs further contend that Michals' failure to protect them resulted in their loss of the $250,000 commission and that Michals should be required to pay damages in that amount.

In each of their assignments of error, plaintiffs contend that the court erred by granting summary judgment for Michals and Twin Towers, Ltd. We have held:

"A summary judgment is properly granted when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue concerning any material fact or the ultimate inferences deducible from such fact or facts and that the moving party is entitled to judgment as a matter of law. [Citations omitted.] In appellate review of a summary judgment, the court views the evidence in a light most favorable to the party against whom judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. [Citation omitted.]"

*Murphy v. Spelts-Schultz Lumber Co.*, 240 Neb. 275, 277, 481

N.W.2d 422, 425 (1992); *Union Pacific RR. Co. v. Kaiser Ag. Chem. Co.*, 229 Neb. 160, 425 N.W.2d 872 (1988). See, also, Neb. Rev. Stat. § 25-1332 (Reissue 1989).

Further, we have held: " 'After the movant for a summary judgment has shown facts entitling the movant to judgment as a matter of law, the opposing party has the burden to present evidence showing an issue of material fact which prevents a judgment as a matter of law for the moving party.' " *Wiles v. Metzger*, 238 Neb. 943, 949, 473 N.W.2d 113, 118 (1991).

Plaintiffs' first assignment of error asserts that the district court erred "in entering summary judgment against Abboud and Doyle . . . as to the theory of recovery of breach of contract." Plaintiffs contend that Michals breached a contract to " 'protect' the [plaintiffs'] commission interest." Brief for appellants at 24-25.

Plaintiffs base this contention on testimony which they say indicates that an "understanding" had been reached by the parties as to the commission. The relevant testimony by Michals provides:

Q. What was the understanding you reached with [Abboud]?

A. . . . I had no discussions with Tony . . . Abboud . . . or anyone else, as far as assurances of anybody receiving a commission. My understanding with them was that they were willing to bring me a client and they and I would deal in good faith on that, which I did. . . .

Plaintiffs contend that Michals was contractually obligated to protect the plaintiffs' ability to collect a commission. Testimony offered by plaintiffs shows the contrary. Michals' testimony specifically states that he did not make any "assurances of anybody receiving a commission," and the plaintiffs' argument appears to be based solely upon his use of the term "understanding."

Additional testimony was offered by plaintiffs to buttress their assertion that an "agreement to protect" existed. Michals testified, "I'm telling you that had they [plaintiffs] come to me . . . and said there was a problem, that they were not being treated fairly, or whatever, yes I would not have closed." Again, these statements are presented by the plaintiffs as

"indications . . . of some type of 'understanding.' " Brief for appellants at 15.

Further, plaintiffs offered the November 8, 1982, nonexclusive listing agreement and the June 2, 1983, single-party listing agreement as evidence of Michals' intent to protect the plaintiffs' commission. The November 8 agreement states, in relevant part:

> In consideration of your agreement to offer for sale the property . . . and to use your efforts to find a Purchaser therefore, I hereby give you the Non-exclusive right to sell Twin Towers Building . . . for the sum of $5,250,000.00 . . . . I agree to allow you to advertise my property for sale . . . . I understand there is to be no charge to me for advertising . . . or any other services that Gateway offers . . . .

All references to payment of a commission by the owner were struck out, and the following was inserted by Abboud at the bottom of the document: "COMMISSON [sic] OF 250,000 TO BE PAID BY BUYER."

As to the June 2 agreement, plaintiffs offered testimony by Doyle to explain the arrangement between Michals and the two real estate agents:

> Q. What did you say to Mr. Michals and what did he say to you?
>
> A. He said, "Any clients that you have, bring it in writing to me and I'll protect you on the commission."
>
> Q. And when you say "protect," what do you mean?
>
> A. That we would be assured that we would get our commission.
>
> Q. From the buyer?
>
> A. From the buyer or the seller, whoever, he'd make sure we got it.

The record does not show that any written agreement between plaintiffs and anyone else was ever presented to Michals. The June 2 agreement was executed when the plaintiffs presented Cutler as a potential buyer. On this issue, the agreement itself provides in toto:

> In consideration of your agreement to present Mike Cutler - Heafey & Heafey to Twin Towers, Ltd. as a

potential purchaser of the office complex located at 3000 Farnam Street, Omaha, Nebraska, and in further consideration of your willingness to make all commission arrangements exclusively with the said Mike Cutler - Heafey & Heafey, the undersigned hereby agree not to solicit, show or in any way attempt to sell said office complex or any part thereof to the said Mike Cutler . . . for a period of 12 (months) . . . after the date hereof.

In examining the disputed contract, it must first be determined what type of agreement is involved. Defendants contend that if the agreement of June 2, 1983, was for the payment of real estate commissions, it is void because it fails to meet the statutory requirements under Neb. Rev. Stat. § 36-107 (Reissue 1988). Section 36-107 provides:

Every contract for the sale of lands between the owner thereof and any broker or agent employed to sell the same, shall be void, unless the contract is in writing and subscribed by the owner of the land and the broker or agent. Such contract shall describe the land to be sold, and set forth the compensation to be allowed by the owner in case of sale by the broker or agent.

It is clear that the contract is one for the potential sale of land, between a landowner and a broker, as contemplated by statute. The contract sufficiently describes the property. The contract does not, however, set out "the compensation to be allowed by the owner."

As to plaintiffs' recovery under a breach of contract theory, Abboud further stated in his deposition that the June 2 agreement was an integration of the oral discussions to that point:

Q. Were you satisfied that [the June 2 agreement] summarized the verbal discussions you had with Mr. Michals regarding your clients?

A. Verbal discussions we had with Mr. Michals, I believe I was satisfied with. I know I was satisfied with this agreement, yes.

Q. Was there anything that was not in [the June 2 agreement] that you felt should be in [it]?

A. No. At the time we accepted the [June 2 agreement], I was satisfied with it.

The plaintiffs contend that the combined "acts of the parties indicate an intention on the [defendants'] part to protect the [plaintiffs'] commission interest." Brief for appellants at 18. Plaintiffs' testimony, however, shows that the June 2 agreement was adopted by the parties as the final and complete expression of their agreement. Abboud stated that the June 2 agreement was "the protection agreement to which [he was] referring."

Proof of prior or contemporaneous oral agreements which alter, vary, or contradict the terms of a written agreement are rendered ineffective by the parol evidence rule. *Perry v. Gross*, 155 Neb. 662, 53 N.W.2d 73 (1952).

> "If negotiations between the parties result in an agreement which is reduced to writing, the written agreement is the only competent evidence of the contract in the absence of fraud, mistake, or ambiguity. . . . Oral testimony is not admissible under the ambiguity exception to the parol evidence rule to establish an understanding at variance with the plain terms of the written instrument."

*Five Points Bank v. White*, 231 Neb. 568, 571, 437 N.W.2d 460, 462 (1989). Accord *Sederstrom v. Burge*, 216 Neb. 512, 343 N.W.2d 770 (1984).

Under the unambiguous language in the June 2 agreement, the defendants agreed only "not to solicit, show or in any way attempt to sell" the Twin Towers building. In exchange for this promise, plaintiffs agreed to present Cutler as a potential purchaser, and further agreed to "make all commission arrangements exclusively with the said Mike Cutler." Plaintiffs now seek to alter the language of the agreement with evidence of prior oral negotiations to establish some type of "understanding" between the parties. The parol evidence rule expressly bars such evidence.

The agreement relied on by plaintiffs as a basis to collect damages from defendants, however, does not "set forth the compensation to be allowed by the owner," but instead provides that plaintiffs were to "make all commission arrangements exclusively with the said Mike Cutler." In any event, the document in question was not signed by the seller, and therefore, any oral contract evidenced by this document is a nullity under § 36-107. There was no written agreement shown

in the evidence that would present a factual issue as to the existence of a written agreement to pay a real estate commission in accordance with § 36-107. The trial court did not err in granting summary judgment to defendants as to this theory of recovery. Plaintiffs' first assignment of error is without merit.

Plaintiffs' second assignment contends that the district court erred "in entering summary judgment dismissing [plaintiffs'] Seventh Amended Petition in its entirety on April 12, 1989; and in denying [plaintiffs'] Motion for New Trial as to the same." Plaintiffs contend that their seventh amended petition "pleads the requisite elements of fraud, and that the evidence on the record creates material factual issues as to the same." Brief for appellants at 24.

We have held that the elements of fraudulent misrepresentation are as follows:

(1) A representation was made; (2) the representation was false; (3) when the representation was made, it was known to be false or was made recklessly without knowledge of its truth and as a positive assertion; (4) the representation was made with the intention that it would be relied upon; (5) there was reliance upon the representation; and (6) damages occurred as a result.

*Earl v. Priority Key Servs.*, 232 Neb. 584, 589, 441 N.W.2d 610, 614 (1989). Accord, *Bock v. Bank of Bellevue*, 230 Neb. 908, 434 N.W.2d 310 (1989); *Nielsen v. Adams*, 223 Neb. 262, 388 N.W.2d 840 (1986). See, also, *Flamme v. Wolf Ins. Agency*, 239 Neb. 465, 476 N.W.2d 802 (1991) (negligent misrepresentation).

In their seventh amended petition to the district court, plaintiffs alleged the following misrepresentations by Michals: (1) defendants would protect the plaintiffs' right to obtain a commission from the buyers, (2) no closing would take place unless that commission was protected and provided for in the closing, and (3) defendants' continued representations that the commission interest would be protected and provided for.

Plaintiffs cite several statements in the record as support for these allegations. Each of the above-cited elements for misrepresentation should therefore be examined in light of this evidence.

As to the first requirement (that representations were made),

Doyle testified that Michals made three specific statements which constituted representations. Initially, Doyle testified, Michals stated that he would "protect" the plaintiffs' commission interest. Next, in response to the initial purchase agreement which did not include the plaintiffs' commission interest, Doyle testified that Michals stated, "[D]on't worry, I'll make sure that I get you in the purchase agreement and protect you." Finally, Doyle testified that Michals said, "I'll make sure you get the commission."

As to the second requirement (that the representations be false), plaintiffs contend that it can now be determined from the record that the statements attributed to Michals are false, since the plaintiffs received no commission for the sale of Twin Towers.

As to the third requirement (that when the representation was made, the declarant knew it was false), the evidence pointed to by plaintiffs allegedly shows that after Michals had made the above statements, a draft of the purchase agreement prepared by his attorney included the following:

> Buyers acknowledge that they will be liable to certain real estate brokers, particularly Bob Doyle and Tony Abboud, for a real estate brokerage commission for the purchase contemplated in this Agreement. . . . Seller shall be solely responsible to pay a real estate commission to Nebraska Real Estate Corporation or a related entity.

It could be inferred from this document that Michals was attempting to help plaintiffs get a commission for the sale and that his statements relating thereto were accurate at the time they were made. There is no contradicting evidence that shows Michals was aware that the statements were false when he made them.

As to the fourth requirement (that the representations were made with the intention they be relied on), the record shows that the statements were not made with the intent that the plaintiffs should rely on them. Plaintiffs, by their own testimony, knew from the provisions of the June 2 agreement that it was plaintiffs' responsibility to make commission arrangements with Cutler. Further, the nonexclusive agreement of November 8, 1982, indicated that any commission on the sale

was to be paid by the buyer. Plaintiffs had nearly 20 months, after the November 8 agreement until the closing in June 1984, to make arrangements for their commission. This they did not do, and now, in this litigation, attempt to place the blame for their inaction upon defendants.

As to the fifth issue (whether the plaintiffs reasonably relied on the representations by Michals), there are a number of factors which require finding that plaintiffs' alleged reliance was not reasonable. Initially, plaintiffs contend that "[a]s a licensed real estate agent, Michals knew or should have known of the Statutory requirement that contracts for commission must be in writing." Reply brief for appellants at 9. This argument, however, ignores the fact that plaintiffs jointly had nearly 40 years of real estate experience and knew the statutory requirements on their own. *Weiner v. Hazer*, 230 Neb. 53, 58, 430 N.W.2d 269, 272 (1988), stated:

> Weiner was a licensed real estate broker, charged with knowledge of § 36-107 concerning the necessity of a written contract for a specified real estate commission. Under the circumstances, Weiner could not in good faith rely on an oral contract for payment of a real estate commission to a broker.

In addition, the written documents in the record before us show that it was the responsibility of the plaintiffs to make any necessary commission arrangements in regard to the sale of the property. An undated letter from Michals states, in relevant part:

> Twin Towers, LTD. will not enter into any type of listing agreement for the sale of the premises . . . .
>
> Twin Towers, LTD. will not pay a commission to a selling agent. Therefore, any and all commission arrangements should be made exclusively with prospective purchasers, who will remain solely responsible for same.

The nonexclusive agreement of November 8, 1982, states, in part, "COMMISSON [sic] OF 250,000 TO BE PAID BY BUYER." Finally, the agreement of June 2, 1983, states that the agreement is made "in further consideration of your willingness to make all commission arrangements exclusively with the said Mike Cutler - Heafey & Heafey."

Plaintiffs were aware for nearly 20 months before the closing in June 1984 that any commission on the sale was to be paid by the buyer and that they themselves were solely responsible for making the arrangements. The fact that the plaintiffs were "left out" of the arrangements 16 days before the closing means little in light of the time that they had prior to the closing to secure a commission agreement.

It was not reasonable for two real estate brokers, each with 20 years of experience, to rely on three brief oral statements to enforce a commission of $250,000.

Plaintiffs have not satisfied the test for misrepresentation and fraud set out in *Earl v. Priority Key Servs.*, 232 Neb. 584, 441 N.W.2d 610 (1989). Plaintiffs' second assignment of error is without merit.

No material issue of fact is present in the record before us. The district court's action in sustaining defendants' motion for summary judgment was correct and is affirmed.

AFFIRMED.