**NATIONAL GYPSUM COMPANY,**
Plaintiff,

v.

**CONTINENTAL BRANDS CORP.**
**and TACC International**
**Corp., Defendants.**

**L & W SUPPLY CORP., Plaintiff,**

v.

**CONTINENTAL BRANDS CORP., TACC**
**International Corp., Morgan Materials,**
**Inc. and Schenectady Chemicals, Inc.,**
**Defendants.**

Civ. A. Nos. 93–12027–NG, 93–12147–NG.

United States District Court,
D. Massachusetts.

July 14, 1995.

Robert C. Cadle, Fordham & Starrett, Boston, MA, Laurence M. Johnson, Boston, MA, for Nat. Gypsum Co.

Alan L. Packer, Green, Friedman & Packer, Boston, MA, Robert D. Friedman, Perkins, Smith & Cohen, Boston, MA, for L & W Supply Corp.

D. Patterson Gloor, David C. Van Dyke, Cassidy, Schade & Gloor, Chicago, IL, Carol A. Kelly, Martin, Magnuson, McCarthy & Kenney, Boston, MA, for Continental Brands Corp.

Don M. Kennedy, Yvette L. Kruger, Yvette K. Mullaney, Goodwin, Proctor & Hoar, Boston, MA, Herbert A. Horgan, Jr., Chestnut Hill, MA, for TACC Intern. Corp.

Elizabeth M. Fahey, Morrison, Mahoney & Miller, Boston, MA, for Morgan Materials, Inc.

## MEMORANDUM AND ORDER

GERTNER, District Judge:

### I. FACTUAL BACKGROUND

These consolidated actions raise difficult issues of corporate successor liability in the products liability context. They require this Court to determine the extent to which the sins of a defunct manufacturer of faulty products may be visited upon a firm which, although formally unrelated to the manufacturer, seeks to continue the business in which the manufacturer was engaged.

Plaintiffs National Gypsum Co. ("NGC") and L & W Supply Corp. ("L & W") are suppliers of building materials to the construction industry. Defendant Continental Brands ("Continental") was, until 1993, a small manufacturer of industrial adhesives located in Woburn, Massachusetts. Among its products was an adhesive used by the plaintiffs in the manufacture of wallboard.

In early 1993, a number of Continental's customers discovered that a batch of this adhesive, which had been incorporated into their products, was defective. This defect caused wallboard manufactured using the adhesive to turn yellow. The defect was later traced to a contaminated chemical involved in Continental's manufacturing process. The chemical had been manufactured by defendant Schenectady Chemicals, Inc. ("Schenectady") and had been sold to Continental by Morgan Materials, Inc. ("Morgan"), a chemical broker.

At approximately the same time that Continental's customers were discovering the yellowing adhesive problem, Continental was attempting to find its way out from under a mountain of debt which it had incurred. This debt was of three types. First, Continental was heavily indebted to BayBank, its secured lender. Continental owed BayBank approximately $1.6 million on a note which was secured by its receivables, inventory and intangible assets. In addition, Continental was obligated to pay the approximately $2.3 million mortgage which BayBank held on its factory site. (The site was, in turn, owned by the 181 New Boston Road Realty Trust ("the Realty Trust"), a real estate trust controlled by the families of three of Continental's four shareholders). Both the note and the mortgage were backed up by personal guarantees from the families of Continental's shareholders.[1]

In addition to its bank debt, Continental also faced large potential liabilities arising from the yellowing problem. Many of its customers had incorporated the defective adhesive into their wallboard products and were asserting claims for the resulting damage. Continental estimated that its liabilities could be as high as $1 million.

Finally, Continental faced another potentially large liability because of the existence of hazardous waste stored at its Woburn site. The cost of state mandated environmental remediation was also estimated to be in the $1 million range.

In an apparent attempt to salvage its operations, Continental sought the assistance of an outside investor to prop up its financial situation. It found one in defendant TACC International, Inc. ("TACC"), a family owned manufacturer of adhesive products, located in Rockland, Massachusetts. TACC had a product line which complimented Continental's and, unlike Continental, was in excellent financial shape.

On June 18, 1993, as a result of a number of agreements worked out between BayBank, Continental's president, Michael Rogers, and TACC's president, Michael D'Amelio, Continental ceased to exist as a functioning entity. In its place was a complex arrangement involving, among other things, two shell corporations, a consulting agreement, and stock options.

One of the shell corporations was MI–CO International, Inc. ("MI–CO"), which was owned entirely by Mr. D'Amelio. MI–CO had been in existence prior to the agreement,

---

1. Continental's four shareholders were Michael Rogers, Judith Stein, Lawrence Cuddy and Benjamin Butcher. Rogers and Cuddy were also officers of Continental, and Judith Stein was the wife of Edward Stein, who was also an officer.

Continental's debt was guaranteed by Butcher, Rogers, Cuddy, and Edward Stein.

The Realty Trust was controlled by Butcher, Rogers, and Edward Stein, who personally guaranteed the mortgage on the factory site.

and had been used by Mr. D'Amelio in other, similar, acquisitions. The other shell was called Claymax Corporation ("Claymax"). Claymax was incorporated at the time of the agreement, and had as its shareholders Michael Rogers, Judith Stein, and Lawrence Cuddy, three of the four Continental shareholders. MI–CO maintained effective control over Claymax through a stock option arrangement, which gave it the right to purchase all of Claymax's stock for a total price of $3.00 on 24 hours notice.

Using these shells, the parties structured a transaction that allowed TACC to effectively purchase Continental's manufacturing operations and real estate, while at the same time attempting to shield TACC from any of its liabilities.

First, Claymax replaced Continental as the nominal tenant at the Woburn factory site. Under the terms of its five year lease with the Realty Trust, Claymax was required to pay monthly rent of $29,166.66. Of this amount, $20,833.33 was paid directly to Bay-Bank to reduce the principal on the Realty Trust mortgage. The remaining $8,333.33 was placed in a special escrow account to fund hazardous waste cleanup on the site. The lease also gave Claymax the right to purchase the property (subject to the Bay-Bank mortgage) for the nominal price of $1,000.

Although Claymax was the tenant under this arrangement, the actual source of rent payments was TACC/MI–CO. Under a so-called "consulting agreement" with Claymax, MI–CO agreed to pay a monthly "consulting fee" of $29,166.66, precisely the amount of Claymax's rent. Because the consulting agreement was assigned to BayBank, MI–CO in fact was obligated to make all of its "consulting payments" directly to the bank.

The net result of this arrangement was that TACC (through MI–CO) was permitted to take a "free look" at the Waltham property: It could pay down the mortgage and fund environmental remediation through the consulting arrangement with Claymax. If the environmental remediation turned out to be economically feasible, it could exercise its right (through its control of Claymax) to purchase the property for a nominal sum. If the property turned out not to be desirable, it could terminate its obligations at any time, and, since MI–CO was essentially assetless, the Bank would have no effective recourse against it.

The second result achieved under the June 18, 1993 agreement was to combine Continental's former manufacturing operations with those of TACC.[2] This took place in two stages. In the first stage, BayBank foreclosed on Continental's inventory and intangibles, and immediately sold them to MI–CO for $531,000.[3] Continental discharged all of its employees, who were immediately hired by Claymax. Then Claymax, under contract with MI–CO, and using the former Continental workforce, processed the inventory which MI–CO had purchased from BayBank. This work, which lasted until October, 1993, took place at the Woburn facility. MI–CO paid Claymax $837,879 during this period.

Stage two began after October, 1993. Manufacturing operations at the Woburn site were discontinued, and almost 80% of the Claymax/Continental employees were discharged. TACC then began manufacturing Continental's old product line at its Rockland headquarters. This product line now accounts for 40% of TACC's sales. The remaining Claymax/Continental employees, which included Continental's top management and part of its sales force, transferred to Rockland as well. All but three of these were hired directly by TACC, including Lawrence Cuddy, a top Continental executive who became director of TACC's national sales force. Three employees, Michael Rog-

---

2. On June 18, 1993, TACC distributed an announcement to Continental's former customers, informing them that "TACC International Corporation ... is pleased to announce the acquisition of the Continental Brands Corporation.... All key Continental personnel have joined TACC International to insure continuity and continued growth." On June 25, 1993, TACC sent out a corrected announcement which stated that TACC

had acquired Continental's assets "through its affiliate."

3. Continental's machinery and equipment was apparently pledged to another secured lender, L & R Associates. MI–CO apparently purchased the machinery and equipment from L & R.

ers, Continental's president, Edward Stein, its chief chemist, and Stephen Choi, Stein's assistant, were retained by TACC as "consultants" through an arrangement with Claymax.

Between November, 1983 and March, 1984, MI–CO continued to make payments to Claymax, totalling approximately $162,000. However, it appears that MI–CO made no payments to BayBank after September, 1993. The reason for this is unclear, although there appears to have been a dispute concerning allocation of responsibility for cleaning up certain unusable hazardous inventories at the Woburn site in order to make it suitable for sublease to a new tenant.

Shortly after the consummation of this complex of transactions, NGC commenced the first of these actions against Continental and TACC, alleging that Continental was directly liable for the damage caused by the defective adhesive, and that TACC was liable as Continental's successor. L & W filed a similar action shortly thereafter, but also named Morgan and Schenectady as defendants.

## II. *PROCEDURAL HISTORY*

NGC filed Civil Action No. 93–12027 on September 14, 1993. On September 30, 1993, L & W filed Civil Action No. 93–12147.

On December 29, 1993, Schenectady filed a motion to dismiss the complaint for lack of personal jurisdiction in No. 93–12147. On August 3, 1994, Judge Stearns of this Court issued an order allowing Schenectady's motion.

On June 16, 1994, TACC filed a motion for summary judgment against NGC in No. 93–12027.

On October 12, 1994, the cases were consolidated, and No. 93–12147 was reassigned to this Court.

On November 21, 1994, TACC moved for summary judgment against L & W as well. The Court ordered L & W to take the deposition of Dr. Edward Stein, a former principal of Continental and a current Claymax employee, concerning issues of successor liability, and to advise the Court by January 3,

1995 as to whether L & W had sufficient information to respond to TACC's motion.

On November 21, 1994, Schenectady moved for entry of final judgment on the basis of Judge Stearns August 3, 1994 order.

On January 5, 1995, L & W advised the Court that it had deposed Dr. Stein, but that it required additional discovery, and in particular, the depositions of Michael R. Rogers, Continental's president, and Michael D'Amelio, TACC's president, before responding to TACC's motion.

On January 12, 1995, Morgan alleged that L & W had failed to properly respond to Morgan's interrogatories, and moved to compel answers and for sanctions.

On January 13, 1995, L & W opposed Schenectady's motion for entry of final judgment, and moved for reconsideration of Judge Stearns' allowance of Schenectady's motion to dismiss.

On January 31, 1995, TACC moved for leave to file cross-claims (in No. 93–12147, the L & W action) and third party claims (in No. 93–12027, the NGC action) against Schenectady and Morgan, seeking contribution and indemnity for any claims against TACC by NGC and L & W.

On February 15, 1995, NGC filed a motion, pursuant to Fed.R.Civ.P. 56(f), requesting the Court to refrain from deciding TACC's motion for summary judgment until such time as NGC is permitted to depose TACC's president Michael D'Amelio and Continental's president Michael Rogers on matters relating to successor liability.

On February 16, 1995, L & W filed its opposition to TACC's motion for summary judgment, and simultaneously filed a Rule 56(f) motion, seeking postponement of TACC's summary judgment motion pending the deposition of Messrs. D'Amelio and Rogers.

On February 22, 1995, Morgan moved for leave to file a cross-claim against Schenectady in No. 93–12147.

On February 23, 1995, NGC moved for leave to amend its complaint to include claims against Schenectady and Morgan.

## III. ANALYSIS

### A. TACC's Liability for Continental's Debts

#### 1. Summary Judgment Standard

A motion for summary judgment will be granted when all the relevant pleadings, viewed in the light most favorable to the non-moving party, present no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Aponte–Santiago v. Lopez–Rivera*, 957 F.2d 40, 41 (1st Cir.1992); *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990); *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). Where the defendant moves for summary judgment, it bears an initial burden of pointing out the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Thereafter, the burden shifts to the plaintiff to demonstrate that there is evidence sufficient to support his claims at trial. *Id.* at 322, 106 S.Ct. at 2552.

Fed.R.Civ.P. 56(f) permits this Court to suspend the consideration of a summary judgment motion pending the completion of further discovery. A rule 56(f) motion may be granted whenever the party opposing summary judgment cannot "for reasons stated present by affidavit facts essential to justify the party's opposition." Fed.R.Civ.P. 56(f). The party making the motion must satisfy four requirements. It should:

■ articulate some plausible basis for the party's belief that specified "discoverable" material facts likely exist which have not yet come in from the cold. There must also be shown [2] some realistic prospect that the facts can be obtained within a reasonable (additional) time, and [3] will, if obtained, suffice to engender an issue both genuine and material. Last [4] the litigant must demonstrate good cause for failure to have conducted the discovery earlier.

*Paterson-Leitch v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985, 988 (1st Cir.1988).

#### 2. TACC's Successor Liability

Because all of its assets were foreclosed upon by secured creditors, Continental is now unable to satisfy plaintiffs' products liability claims.[4] Plaintiffs contend, however, that TACC is liable for those claims as well since it has, in effect, succeeded to Continental's business.

■ In Massachusetts, as in most jurisdictions, the general rule is that one corporation may ordinarily purchase all of the assets of another without taking on any of its liabilities. *McCarthy v. Litton Industries, Inc.*, 410 Mass. 15, 21, 570 N.E.2d 1008 (1991); *Guzman v. MRM/Elgin*, 409 Mass. 563, 566, 567 N.E.2d 929 (1991); *Dayton v. Peck, Stow and Wilcox Co.*, 739 F.2d 690, 692 (1st Cir. 1984). *See, generally* 15 Fletcher, Cyclopedia of the Law of Private Corporations § 7122 at 231 (perm. ed. 1991). The rule furthers the public policy in favor of the free alienation of capital. *See Guzman*, 409 Mass. at 570, 567 N.E.2d 929. By permitting firms to freely dispose of their assets without encumbrance, the rule, at least in theory, insures that those assets will be allocated to their most efficient use, thus benefitting the economy as a whole. *Id.*

At the same time, the rule does not leave creditors of the selling corporation without a remedy. If the selling corporation disposes of its assets in a bona fide sale, the result is that those assets will be exchanged for money or other valuables which, presumably, will have at least as much value as the property being disposed of. Thus, to the extent that corporate creditors could have satisfied their claims by executing on the assets of the selling corporation prior to the transaction, that remedy remains theoretically available after a sale-of-assets transaction has taken place.

In practice, of course, a corporate sale-of-assets transaction may leave some creditors without effective legal recourse. In the most obvious case, the selling corporation may simply not have had sufficient assets to satisfy its obligations at the time of the sale. Its assets may, for example, be sold to pay a

---

**4.** Continental apparently had insurance coverage for products liability claims in the amount of $100,000. The claims, however, exceeded $1 million.

secured debt, leaving no surplus for distribution to unsecured creditors.

Such insolvencies are the bread and butter of the bankruptcy courts and, while unfortunate, are the inevitable casualties of a competitive market economy. More importantly for the purposes of this discussion, they do not offend our sense of equity. While creditors may lose out, corporate shareholders are penalized as well, as an insolvency will reduce the value of their stake in the corporation to zero.

More problematic, however, is a sale-of-assets transaction which actually diminishes the net worth of a corporation, leaving it less able to pay its debts than it was before. This may principally happen in one of two ways. The selling corporation itself may receive less than full value for its assets, while the purchaser pays all or part of the "real" purchase price directly to the seller's shareholders.[5] Alternatively, the selling corporation, having received full value, may immediately distribute the proceeds to its shareholders before creditors are able to enforce their claims.

██ In order to protect the rights of creditors in such transactions, courts have developed four exceptions to the general rule of no successor liability. "[L]iability may be imposed on the purchasing corporation (1) where the purchaser impliedly or explicitly agrees to assume the liability of the seller, (2) where the transaction is entered into fraudulently to avoid liability, (3) where the transaction amounts to a de facto merger, or (4) where the purchasing corporation is 'merely a continuation' of the selling corporation." *McCarthy,* 410 Mass. at 21, 570 N.E.2d 1008. *See also Guzman,* 409 Mass. at 566, 567 N.E.2d 929; *John S. Boyd Co., Inc. v. Boston Gas Co.,* 992 F.2d 401, 408 (1st Cir.1993); *Dayton,* 739 F.2d at 692; *In re Acushnet River & New Bedford Harbor Pro-*

*ceedings Re Alleged PCB Pollution,* 712 F.Supp. 1010, 1014 (D.Mass.1989).

In this case, plaintiffs allege that the June 18, 1993 transaction was either a fraudulent conveyance, or resulted in a de facto merger or mere continuation of Continental's business. I examine each of these contentions in turn.

### a. *Is there Evidence of a Fraudulent Conveyance?*

To establish that the sale of Continental's assets to MI–CO constituted a fraudulent conveyance, the plaintiffs would have to show that Continental was insolvent immediately after the sale, that Continental made the sale without fair consideration, or with the intent to hinder creditors, and that the net result of the sale was a wrongful diminution of the assets available to pay Continental's creditors.[6] M.G.L. ch. 109A, §§ 3, 4, 7; *Shamrock, Inc. v. F.D.I.C.,* 36 Mass.App.Ct. 162, 170, 629 N.E.2d 344 (1994) ("it is of the essence of a fraudulent conveyance that there is a diminution in the assets of the debtor available to creditors."). Because the transaction involved a foreclosure by BayBank on Continental's assets, the plaintiffs would also have to show that Continental colluded with BayBank in effecting the transfer. *See Sheffield Progressive, Inc. v. Kingston Tool Co.,* 10 Mass.App.Ct. 47, 49, 405 N.E.2d 985 (1980).

The evidence clearly supports the conclusion that Continental was insolvent immediately after the transaction occurred, and that BayBank's foreclosure was part of a larger agreement between the parties. Thus, the critical inquiry is whether the transaction was without fair consideration or with the intent to defraud creditors, and it diminished the otherwise assets available to pay the plaintiffs' claims.

---

**5.** To be sure, there may be a situation in which the purchasing corporation discounts the purchase price precisely because it is also agreeing to assume the seller's debts. In the situations described above, the selling price is artificially lowered so that the selling corporation cannot pay the creditors, at the same time that the purchasing corporation expressly seeks to avoid liability.

**6.** A transaction could fit within this category even if it was technically insolvent before the transaction if the sale was without fair consideration and had the effect of further diminishing the assets available to creditors.

■ Fair consideration is defined as a "fair equivalent" value given "in good faith". M.G.L. ch. 109A, § 3. For consideration to be fair, there must be a "reasonable equivalence between the purchase price and the value of the property received." *In re Morse Tool*, 148 B.R. 97, 136 (Bankr.D.Mass.1992). "Where bankruptcy is not clearly imminent on the date of the challenged conveyance, the weight of authority holds that assets should be valued on a going concern basis." *Id.* quoting *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1067 (1992). *See also In re WCC Holding Corp.*, 171 B.R. 972, 984 (Bankr.N.D.Tex.1994).

NGC contends that there are genuine issues of material fact concerning the adequacy of the consideration, and points to the fact that TACC/MI–CO only paid "forced liquidation value" for Continental's assets, but received in return a "going concern."[7] Indeed, it is not disputed that immediately after the June 18, 1993 transaction, TACC/MI–CO controlled, in effect, all of Continental's former assets except for its accounts receivable, and, through Claymax, continued to operate Continental's former business at the Woburn facility.

What the record fails to reveal, however, is whether, in fact, Continental was saleable as a going concern as of June 18, 1993. For while it is true that TACC/MI–CO did continue to operate Continental's business for a short time after the sale, it is also true that the end result of the transaction was the termination of almost 80% of Continental's former workforce, and the closing of its Wo-

burn facility. Moreover, since the present record does not contain any description or characterization of Continental's financial condition on June 18, 1993, it is impossible to tell whether a bankruptcy or other type of liquidation would have netted any additional assets for the benefit of creditors. Without more information, I cannot determine whether Continental was a viable business at the time its assets were sold, or whether it was merely a failed entity, from which TACC/MI–CO purchased, in good faith, the salvageable remains.

In addition to this issue of asset valuation, the record is also unclear as to whether a higher sale price from the June 18, 1993 transaction would have affected Continental's ability to pay plaintiffs' products liability claims. It appears that, even after BayBank foreclosed upon and liquidated most of Continental's assets, there remained a deficiency of nearly $2 million.[8] Since BayBank had a lien on essentially all of Continental's assets, it would have been entitled to any additional value received by Continental in a sale of assets transaction up to the amount needed to satisfy the deficiency. It is thus unclear whether any conceivable sale of Continental's assets could have produced sufficient proceeds to pay any of plaintiffs' claims.

In sum, plaintiffs' ability to collect from TACC under their fraudulent conveyance theory turns on their ability to prove that Continental would have been able to satisfy products liability claims (after satisfying any secured lenders) had it been paid the full value of what it transferred to MI–CO.[9] Sig-

7. An independent appraiser conducted a "walk through" appraisal of the "forced liquidation value" of Continental's assets in May, 1993. He concluded that Continental's inventory had a forced liquidation value of $485,084. TACC/MI–CO paid BayBank $531,000 for Continental's inventory plus its intangible assets, including a trademark and customer lists.

8. An internal BayBank memorandum, dated March 1, 1994, states that Continental's outstanding obligations (both under its note and its obligation to pay the Realty Trust mortgage) totalled $2,865 million as of that date. The memorandum estimated the value of the remaining security (i.e. the Woburn factory site) to be between $170,000 and $904,000, thus leaving a deficiency in excess of nearly $2 million.

9. For the purposes of summary judgment, I have treated MI–CO and TACC as a single entity. I pause here briefly to explain why. The record is essentially bare of any detail concerning the relationship between TACC and MI–CO, other than the fact that TACC's president, Michael D'Amelio, is MI–CO's sole shareholder, and that TACC has somehow obtained the benefit of the assets which MI–CO purchased from Continental. This evidentiary void is understandable since the plaintiffs have been unable to depose Mr. D'Amelio concerning this relationship.

What little evidence there is does suggest that MI–CO operated as a mere extension of TACC. For example Dr. Stein, who was nominally employed by Claymax under contract with MI–CO, testified that his paychecks were signed by TACC's controller, that he was unaware that

nificant to this inquiry would be an examination of Continental's balance sheet at the time of the sale, and an assessment of Continental's value, if any, as an going concern. Also of significance would be evidence of any benefits conferred by TACC/MI–CO on Continental's shareholders, through Claymax or otherwise, in connection with the June 18, 1993 transaction. If it could be shown that such benefits were conferred in order to allow Continental's shareholders to receive the benefit of Continental's assets in preference to unsecured creditors, this fact would be evidence in support of a fraudulent conveyance claim. *See, e.g., Schmoll v. ACandS, Inc.*, 703 F.Supp. 868, 874 & n. 11 (D.Or. 1988).

### b. *De Facto Merger or Mere Continuation*

#### (1) *The Nature of the Rule*

Slight variations on the theme of fraudulent conveyance are found in the concepts of "de facto merger" and "mere continuation." While these two labels have been enshrined separately in the canonical list of exceptions to the general rule of no successor liability, they appear, in practice to refer to the same concept (*see Acushnet*, 712 F.Supp. at 1019, n. 15), and courts have often used the two terms interchangeably. *See, e.g. Travis v. Harris Corp.*, 565 F.2d 443, 446–447 (7th Cir.1977); *Fehl v. S.W.C. Corp.*, 433 F.Supp. 939, 945–946 (D.Del.1977); *Glynwed, Inc. v. Plastimatic, Inc.*, 869 F.Supp. 265, 275–276 (D.N.J.1994); *Ruedy v. Toledo Factories Co.*, 61 Ohio App. 21, 22 N.E.2d 293, 296 (1939); *John S. Boyd Co.*, 992 F.2d at 408–409; *LeSane v. Hillenbrand Industries*, 791 F.Supp. 871, 875 (D.D.C.1992); *Acushnet*, 712 F.Supp. at 1019, n. 15.

The concept of "de facto merger" has usually been applied to situations in which the ownership, assets and management of one corporation are combined with those of another, preexisting entity. *See Ruedy*, 22 N.E.2d at 293; *Drug, Inc. v. Hunt*, 35 Del.

339, 168 A. 87 (1933); *Shannon v. Samuel Langston Co.*, 379 F.Supp. 797 (W.D.Mich. 1974); *Keller v. Clark Equipment Co.*, 715 F.2d 1280, 1283–1284, 1291 (8th Cir.1983) *cert. den.* 464 U.S. 1044, 104 S.Ct. 713, 79 L.Ed.2d 176 (1984); *Hoche Productions, S.A. v. Jayark Films Corp.*, 256 F.Supp. 291, 296 (S.D.N.Y.1966). By contrast, a "mere continuation" has most often been found where the owners of the selling entity set up the buyer with the specific purpose of continuing their business under a new form. *See Arthur Elevator Co. v. Grove*, 236 N.W.2d 383, 392 (Iowa 1975) (partnership reforms as a corporation); *In re Johnson–Hart Co.*, 34 F.2d 183 (D.Minn.1929) (partnership reforms as a corporation); *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 175–176 (5th Cir.1985) (division of selling corporation sold to purchasing corporation owned by certain shareholders of seller); *Fiber–Lite Corp. v. Molded Acoustical Products of Easton, Inc.*, 1994 WL 541395 (E.D.Pa.1994) (purchaser corporation owned by children of seller corporation's sole shareholder). However, this usage has not been completely consistent. *See Jackson v. Diamond T. Trucking Co.*, 100 N.J.Super. 186, 241 A.2d 471, 477 (1968) (mere continuation found when assets of predecessor corporation transferred to preexisting successor corporation owned by same shareholder); *Acushnet*, 712 F.Supp. at 1012, 1015–1019 (de facto merger found where parent corporation set up subsidiary solely to purchase assets of putative predecessor corporation).

The de facto merger doctrine appears to have had its origins in cases relating to corporate taxation and minority shareholder rights. *See Helvering v. Metropolitan Edison Co.*, 306 U.S. 522, 529, 59 S.Ct. 634, 638, 83 L.Ed. 957 (1939) (where sale of assets was a de facto merger, successor corporation could deduct expenses of predecessor); *San Joaquin Ginning Co. v. McColgan*, 20 Cal.2d 254, 125 P.2d 36, 39–41 (1942) (corporation was not entitled to a refund of franchise tax where the sale of its assets resulted in a de

Michael D'Amelio was dealing with him as president of MI–CO, and that his research work for Claymax resulted in new products in TACC's product line.

I need not resolve the issue now. As explained in more detail below, I believe that further dis-

covery is warranted in this case, and the parties will therefore have the opportunity to more fully explicate the TACC/MI–CO relationship at a later date.

facto merger with its successor); *Marks v. Autocar Co.*, 153 F.Supp. 768 (E.D.Pa.1954) (minority shareholder entitled to an appraisal under corporate merger statute where corporation's sale of assets for stock was a de facto merger). *See also Cyr v. B. Offen & Co., Inc.*, 501 F.2d 1145, 1152 (1st Cir.1974) ("these exceptions were developed in the context of tax assessment"). In the tax cases, courts refused to attach significance for tax purposes to changes in corporate form where there was no real change in the underlying ownership interest of the business. *See San Joaquin Ginning*, 125 P.2d at 41 (corporation dissolved after transferring its assets to its parent); *Helvering*, 306 U.S. at 528, 59 S.Ct. at 637–38 (same). In the minority shareholder cases, the courts have held that when a corporation sells all of its assets in exchange for stock in the buyer, the result was a de facto merger in which the selling corporation's minority shareholders were involuntarily made shareholders of the purchaser, thus giving them the right to an accounting, as in a de jure merger. *See Marks*, 153 F.Supp. at 771.

A focus on the realities of corporate ownership was also a constant theme in early cases employing the "de facto merger" concept in the successor liability context. Applying the familiar principle that a corporation cannot disable itself from responding to liability for its acts by distributing its assets (see *Cyr*, 501 F.2d at 1153 *citing Pierce v. U.S.*, 255 U.S. 398, 41 S.Ct. 365, 65 L.Ed. 697 (1921)), courts would scrutinize corporate asset transfers to determine whether they permitted shareholders to retain the benefits of their ownership interest while leaving creditors without a remedy.

For example, in *U.S. Fidelity & Guaranty Co. v. Citizens Nat. Bank*, 13 F.2d 213, 222 (D.N.M.1924), American National Bank transferred all of its assets to Citizens' National Bank. No consideration was paid to American National, but shares of Citizens' National were issued directly to American National's shareholders. The court noted that the assets which had been transferred were more than sufficient to pay American National's liabilities, and found that Citizens' National should be held liable for them as a consequence.

Similarly, in *Drug, Inc.*, 168 A. at 95–96, Drug, Inc. purchased all of the assets of Household Products, Inc., but paid for them by issuing stock to Household Products' shareholders. The court noted that Household Products' creditors would be entitled, in a court of equity, to seek relief against Household Products' shareholders. Sitting in law, however, the court maintained that the transaction constituted a de facto merger under which Drug, Inc. succeeded to Household Products' liabilities.

The same pattern is found in *Ruedy*, 22 N.E.2d at 295–296. Two corporations were owned by the same shareholders. At one point, one of the corporations dissolved, and transferred all of its assets to the other. The consideration for this transaction, stock in the transferee, was turned over directly to the shareholders of the first corporation. Here too, the court found a de facto merger, and held the successor liable for the predecessor's debts.

Finally, in *Hoche Productions*, 256 F.Supp. at 296, a corporation transferred all of its assets to its parent, without payment of consideration. The court held that the parent was, consequently, liable for the subsidiary's liabilities.[10]

In all of these cases, the pattern is virtually identical: a corporation which is solvent (or if technically insolvent, at least some assets to pay its creditors), transfers its assets in a collusive transaction to another entity in which these same shareholders end up with an equity interest, now unencumbered. The transaction is structured so that the selling corporation is either not paid at all, or is paid with stock which is issued directly to its shareholders. The intended result in all cases is the same, to permit the owners of the selling corporation to avoid paying creditors without losing control of their business. It is this intended result which the successor

---

10. A similar focus on continuity of ownership is found in the early "mere continuation" cases. *See In re Johnson–Hart Co.*, 34 F.2d 183 (D.Minn. 1929); *Jackson v. Diamond T. Trucking Co.*, 100 N.J.Super. 186, 241 A.2d 471, 474, 477 (1968).

liability exceptions prevent.[11] *See also American Railway Express Co. v. Commonwealth,* 190 Ky. 636, 228 S.W. 433 (1920) *appeal dismissed* 263 U.S. 674, 44 S.Ct. 4, 68 L.Ed. 500 (1923); *Wesco Supply Co. v. El Dorado L & W Co.,* 107 Ark. 424, 155 S.W. 518 (1913); *Shadford v. Detroit Y. & A.A. Ry.,* 130 Mich. 300, 89 N.W. 960 (1902); *Grenell v. Detroit Gas Co.,* 112 Mich. 70, 70 N.W. 413 (1897). *Compare West Texas Refining & Development Co. v. C.I.R.,* 68 F.2d 77, 81 (10th Cir.1933) (no successor liability where selling corporation received valuable consideration for sale of its assets, which was used to pay all of its known debts prior to dissolution); *Kloberdanz v. Joy Mfg. Co.,* 288 F.Supp. 817, 821 (D.Colo.1968) (no successor liability where selling and purchasing corporation had no common stockholders or officers, and were completely separate entities).

In recent decades, however, changes in substantive tort law have led some courts to extend successor liability to cases outside the paradigm described above. Because of the widespread adoption of strict products liability, courts have been confronted by plaintiffs seeking to bring actions based on the wrongs of long-dead corporate entities. *See McCarthy,* 410 Mass. at 21, 570 N.E.2d 1008; *Guzman,* 409 Mass. at 566, 567 N.E.2d 929; *Dayton,* 739 F.2d at 692; *Kloberdanz,* 288 F.Supp. at 822; *Travis,* 565 F.2d at 447; *Cyr,* 501 F.2d at 1151–1154; *Ray v. Alad Corp.,* 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977); *Turner v. Bituminous Casualty Co.,* 397 Mich. 406, 244 N.W.2d 873 (1976); *Knapp v. North American Rockwell Corp.,* 506 F.2d 361, 367–369 (3rd Cir.1974); *Shannon v. Samuel Langston Co.,* 379 F.Supp. 797, 801 (W.D.Mich.1974); *Mozingo v. Correct Mfg. Corp.,* 752 F.2d 168 (5th Cir.1985); *Rivers v. Stihl, Inc.,* 434 So.2d

766, 771 (Ala.1983); *Conn v. Fales Division of Mathewson Corp.,* 835 F.2d 145 (6th Cir. 1987); *Wallace v. Dorsey Trailers Southeast, Inc.,* 849 F.2d 341 (8th Cir.1988); *Ostrowski v. Hydra–Tool Corp.,* 144 Vt. 305, 479 A.2d 126 (1984); *Simoneau v. South Bend Lathe, Inc.,* 130 N.H. 466, 543 A.2d 407 (1988); *Downtowner, Inc. v. Acrometal Products, Inc.,* 347 N.W.2d 118 (N.D.1984); *Jones v. Johnson Machine and Press Co. of Elkhart, Indiana,* 211 Neb. 724, 320 N.W.2d 481 (1982); *Niccum v. Hydra Tool Corp.,* 438 N.W.2d 96 (Minn.1989); *DeLapp v. Xtraman, Inc.,* 417 N.W.2d 219 (Iowa 1987); *Bernard v. Kee Mfg. Co., Inc.,* 409 So.2d 1047 (Fla.1982); *Martin v. Abbott Laboratories,* 102 Wash.2d 581, 689 P.2d 368 (1984); *Dawejko v. Jorgensen Steel Co.,* 290 Pa.Super. 15, 434 A.2d 106 (1981); *Ramirez v. Amsted Industries, Inc.,* 86 N.J. 332, 431 A.2d 811 (1981); *Fish v. Amsted Industries, Inc.,* 126 Wis.2d 293, 376 N.W.2d 820 (1985); *Hamaker v. Kenwel–Jackson Machine, Inc.,* 387 N.W.2d 515 (S.D.1986).[12] In these cases, it is not the wrongful behavior of the predecessor corporation, but simply the passage of time, which makes the tortfeasor unavailable for suit.[13]

Faced with the prospect that tort victims would be left without a meaningful remedy, some courts responded by extending the successor liability concept to include firms which had no common ownership interest with the manufacturer which committed the tort, or which had paid adequate consideration to the selling corporation in exchange for its assets. *See Knapp,* 506 F.2d at 367–369; *Cyr,* 501 F.2d at 1151–1154; *Ray,* 560 P.2d at 8; *Turner,* 244 N.W.2d at 883–884; *Shannon,* 379 F.Supp. at 801; *Mozingo,* 752 F.2d at 174–176; *Rivers,* 434 So.2d at 771–772; *Ramirez,*

---

**11.** It is worth noting that all of these examples could have been alternatively characterized as fraudulent conveyances.

**12.** Similar issues have recently arisen concerning liability for hazardous waste cleanup under the federal superfund law, 42 U.S.C. § 9601, *et seq. See John S. Boyd Co.,* 992 F.2d at 408; *Acushnet,* 712 F.Supp. at 1014; *Kleen Laundry and Dry Cleaning Services, Inc. v. Total Waste Management Corp.,* 817 F.Supp. 225 (D.N.H. 1993); *Blackstone Valley Electric Co. v. Stone & Webster, Inc.,* 867 F.Supp. 73 (D.Mass.1994).

**13.** In some states, statutes limit the time during which a dissolved corporation may be sued. *See, e.g.* M.G.L.c. 156B, § 102 (three year limit); Del. Code Ann. tit. 8, § 278. *But see Everett Credit Union v. Allied Ambulance Services, Inc.,* 12 Mass.App.Ct. 343, 348–349, 424 N.E.2d 1142 (1981) (interest of former shareholders in dissolved corporation may be reached by corporate creditors). In any event, the practical difficulties of tracing corporate assets to distributee shareholders are likely to be great.

431 A.2d at 815–823; *Dawejko,* 434 A.2d at 107–112; *Martin,* 689 P.2d at 384–389.

The *Knapp* and *Shannon* courts, for example, found successor liability even where the selling corporation continued in existence for a period of time after the sale, during which it would have been able to pay any judgments against it. In *Knapp,* the court found that the seller's existence after the sale was purely formal, and that the sale agreement entailed its dissolution in due course. Determined to engage in a "an analysis of public policy considerations rather than … a mere proscrutean application of formalities," the court held that the public policy of Pennsylvania favored risk spreading and the compensation of individual victims, and that in light of these policies, the short term existence of the selling corporation after the sale was of no relevance. It therefore concluded that liability could be imposed on the successor firm. 506 F.2d at 367–370. The *Shannon* court reached the same result on similar facts. *See Shannon,* 379 F.Supp. at 800–803.

The *Knapp* and *Shannon* decisions represented only slight modifications of the traditional rule, since they both involved sales in which assets were exchanged for shares of the buying corporation, thus maintaining a continuity of ownership. More radical departures from the customary rule are found in the *Cyr* and *Turner* cases. In *Cyr,* a sole proprietorship was sold, after the proprietor's death, to a corporation formed by its employees. The contract of sale required that the business be run under the same principles as it had been as a proprietorship, and this was in fact done. The court, sitting in diversity and applying New Hampshire law, found that the traditional rule had not yet been interpreted in the context of a claim for negligence or strict liability. It concluded that the public policies underlying tort liability mitigated in favor of extending the "mere continuation" exception to allow a finding of successor liability on the facts of the case, even where there was no continuity of ownership. 501 F.2d at 1152–1154.

In *Turner,* the Michigan Supreme Court specifically held that successor liability did not turn on whether there was common ownership between the seller and purchaser corporation. 244 N.W.2d at 880. The Court questioned the usefulness of the distinction between asset sales which are made for cash and those made for stock. For example, where a large corporation purchases the assets of a small one, the resulting common ownership interest after the transaction is de minimus, yet under the traditional rule, this could be characterized as a de facto merger. The court reasoned that there was no principled reason for liability to follow the assets sold to the purchasing corporation in that case, but not when the sale is for an equivalent amount of cash. *Id.* The court concluded that, given the remedial and risk spreading goals of tort law, it was best to impose liability on corporations which continue the enterprise of the selling corporation, thus insuring that potential tort claims against a manufacturer would not be extinguished simply because of a change in ownership. *Id.* at 883–884.[14] *See also Rivers,* 434 So.2d at 771–772.

The most radical departure from past practice came in the decision of the California Supreme Court in *Ray.* The Court adopted what has come to be known as the "product line" theory of successor liability. Under this theory, there is no inquiry at all as to whether the business enterprise of the selling corporation continues under the aegis of the purchasing firm. Rather, if the selling firm has ceased to exist, and whether the purchasing firm continues to manufacture the product which is subject of the lawsuit, liability follows as a matter of law. *Ray,* 560 P.2d at 11. Thus, under *Ray,* the gradual transition of successor liability theory from its original grounding in corporate law to its new incarnation as a theory of products lia-

---

**14.** Under the rule announced in *Turner,* the factors to be considered in determining whether there was a continuity of enterprise included 1) whether there was a basic continuity of the enterprise, including retention of key personnel, assets, and operations, 2) whether the selling corporation ceased ordinary business operations and liquidated as soon as practicable, 3) whether the purchasing corporation assumed those liabilities necessary for the continuation of normal business, and 4) whether the purchasing corporation held itself out to the world as the continuation of the seller. 244 N.W.2d at 883–884.

bility was complete. *See* Michael D. Kristofco, Comment, *Successor Liability: The Debate over the Continuity of Enterprise Exception in Ohio is Really No Debate at All,* 21 Ohio N.U.L.Rev. 297 (1994).

Although a small number of state courts have chosen to follow the lead of *Ray* and adopt a similar "product line" theory of liability (*see Martin,* 689 P.2d at 388; *Dawejko,* 434 A.2d at 111; *Ramirez,* 431 A.2d at 824–825), the overwhelming majority of courts, including those of Massachusetts, have refused to expand the traditional rule without clear legislative guidance.[15] *See Guzman,* 409 Mass. at 570–571, 567 N.E.2d 929 (product line theory raises "issue of broad public policy involving balancing the interests of future plaintiffs and defendants, which the Legislature is better equipped to resolve"); *Fish,* 376 N.W.2d at 828; *Hamaker,* 387 N.W.2d at 519–521; *Conn,* 835 F.2d at 147–148; *Wallace,* 849 F.2d at 343–344; *Ostrowski,* 479 A.2d at 127; *Simoneau,* 543 A.2d at 408–09; *Downtowner,* 347 N.W.2d at 124–125; *Jones,* 320 N.W.2d at 483–484; *Niccum,* 438 N.W.2d at 98–100; *DeLapp,* 417 N.W.2d at 220–223; *Bernard,* 409 So.2d at 1049–1050. These courts have generally reasoned that (1) the law should not impose liability without a corresponding duty, (2) that the exceptions threatens small business who may not be able to insure against such liabilities, and (3) the exception is such a radical change as to require legislative action. *See DeLapp,* 417 N.W.2d at 221.

### (2) *Application in this Case*

Whatever the merits of expanded notions of successor liability, I am bound to apply law of Massachusetts as interpreted by its courts. *See Dayton,* 739 F.2d at 694–695; *Needleman v. Bohlen,* 602 F.2d 1, 3 (1st Cir.1979). The Massachusetts Supreme Judicial Court has unequivocally rejected the product line theory of liability, and while it has not directly addressed the less radical "enterprise" theory of *Turner,* (*see McCarthy,* 410 Mass. at 23, 570 N.E.2d 1008), there is no indication that it would adopt any theory justifying successor liability without fault.[16] *See Guzman,* 409 Mass. at 570, 567 N.E.2d 929 ("whether liability for products that are defective without fault should be imposed in this Commonwealth, and, if so, what types of transactions would give rise to liability, are matters of social policy" on which "we ... defer[ ] to the Legislature's judgment...."); *McCarthy,* 410 Mass. at 23, n. 6, 570 N.E.2d 1008 (noting that majority of states considering "continuity of enterprise" theory have rejected it); Kristofco, *Successor Liability,* 21 Ohio N.U.L.Rev. 297 (arguing that the "product line" and "continuity of enterprise" exceptions are theoretically indistinguishable). I will therefore apply the traditional de facto merger or continuation analysis, with its keystones of continuous ownership and inequitable conduct, in order to determine whether TACC may be held liable here as Continental's successor.[17] *See Day-*

---

**15.** One conceivable legislative response to the problem would be to require liquidating corporations to purchase insurance against future products liability claims. *See* Michael D. Green, *Successor Liability: The Superiority of Statutory Reform to Protect Product Liability Claimants,* 72 Cornell L.Rev. 17 (1986).

**16.** Even if "product line" or "continuity of enterprise" theories were available to this court, it is unclear that they would be applicable here. Plaintiff's claims arose prior to the June 18, 1993 sale of assets, and Continental remained amenable to suit afterwards. Thus the concern underlying these theories, compensation of tort victims where the tortfeasor corporation is no longer available, is not germane here. *See LaFountain v. Webb Industries Corp.,* 951 F.2d 544, 547–548 (3rd Cir.1991) (destruction of predecessor, thus depriving plaintiff of a remedy, is a prerequisite for a finding of product line successor liability).

Of course, if the June 18, 1993 transaction destroyed plaintiffs' remedies by denuding Conti-

nental of its pre-existing value without fair consideration, plaintiffs might have a viable fraudulent conveyance claim, as described above.

**17.** Although plaintiffs contend that a de facto merger or mere continuation does not require a continuity of ownership interest, none of the cases they rely on for this proposition support it in the context of this case.

For example, in *Acushnet,* the case upon which plaintiffs primarily rely, the predecessor corporation, Belleville, transferred all of its assets to its successor, Aerovox, in exchange for shares of stock in RTE, Aerovox's parent company. Although this did not formally satisfy the requirement that the merger result in a "continuity of shareholders", the court found that the substitution of shares in RTE for shares in Belleville achieved "the same practical consequences" and "virtually" the same result. 712 F.Supp. at 1017. As the court explained, "to hold otherwise would be to effectively gut the de facto merger

*ton,* 739 F.2d at 693 (describing "continuity of shareholders" as a "key factor"); *Bud Antle, Inc. v. Eastern Foods, Inc.,* 758 F.2d 1451, 1458–1459 (11th Cir.1985); *Travis,* 565 F.2d at 447; *Parson v. Roper Whitney, Inc.,* 586 F.Supp. 1447, 1449–1450 (W.D.Wisc. 1984); *Niccum,* 438 N.W.2d at 99; *Fish,* 376 N.W.2d at 824; *Hamaker,* 387 N.W.2d at 518; *Manh Hung Nguyen v. Johnson Machine & Press Corp.,* 104 Ill.App.3d 1141, 60 Ill.Dec. 866, 872, 433 N.E.2d 1104, 1110 (1982); Jerry J. Phillips, *Product Line Continuity and Successor Corporation Liability,* 58 N.Y.U.L.Rev. 906, 912–913 (1983).

Turning now to the evidence in this case, I find that, as with my discussion of plaintiffs' fraudulent conveyance claims above, I am hampered here by what appears to be an incomplete factual record. While the evidence clearly shows that Continental's owners have no direct equity interest in TACC or MI–CO, there is at least some suggestion that they may be more than mere employees of TACC or Claymax.

In particular, the plaintiffs have presented a document, produced by TACC in discovery, which purports to be a memorandum from Michael Rogers, Continental's president, to Michael D'Amelio, TACC's president. The memorandum, dated August 8, 1993, discusses their joint plans for an "IPO" which is presumably an initial public offering of stock, and a plan for "shareholder liquidity." The memorandum also discusses different strategies for attracting capital from outside investors, and the possibility of acquiring other businesses prior to the IPO. Throughout the memorandum, the term "we" is used, suggesting that both Rogers and D'Amelio have an interest in the outcome of the contemplated transaction.

Because neither Rogers nor D'Amelio has been deposed, the record is barren of any explanation of this document. In particular there is no indication as to what financial interest Continental's shareholders have in TACC's future profits. The answer to this question is crucial since it will permit the Court to determine whether Continental's shareholders have, in any sense, retained a share in what was valuable in their former company while avoiding any payment to products liability claimants.[18]

The other factors which a court may consider in determining whether a de facto merger has taken place include whether there is a continuation of the seller's enterprise, whether the seller ceases its ordinary business operations and liquidates as soon as practically possible, and whether the purchasing corporation assumes those obligations of the seller necessary for the unin-

---

doctrine. To avoid successor liability, a purchasing corporation would merely need to create a wholly-owned subsidiary to formally acquire the assets of a corporation and pay for those assets with its own stock. Such a result is neither requisite nor wise." *Id.* In any event, *Acushnet* involved successor liability under the superfund law, the expanded liability notions of which are not applicable to common law tort actions under Massachusetts law.

Similarly, in *Fiber–Lite Corporation v. Molded Acoustical Products of Easton, Inc.,* 1994 WL 541395 (E.D.Pa. Sept. 29, 1994), the court found that the defendant was the mere continuation of a corporation whose assets had been foreclosed upon by a bank. The bank sold the assets to the defendant, which had the same president, directors and employees as the earlier corporation. The only difference was that the new corporation was owned by the children of its predecessor's sole shareholder. The court found that in spite of this change, the de facto ownership and control of the two corporations remained identical. *Id.* at *6–*7.

The final case relied upon by plaintiffs is *Diaz v. South Bend Lathe, Inc.,* 707 F.Supp. 97 (E.D.N.Y.1989). In *Diaz,* a products liability claimant brought suit against the defendant many years after it had purchased the assets of an (unrelated) corporation which manufactured the offending product. Although the court purported to find a "de facto merger" even though there was no continuity of shareholders, a close reading reveals that it relies entirely on the "continuity of enterprise" type reasoning of *Cyr,* which has been repudiated by Massachusetts courts. *See* 707 F.Supp. at 101.

18. Plaintiffs point to the similarity in ownership interests between Continental and Claymax. But this fact is irrelevant to a determination of whether Continental's shareholders have an interest in TACC. Plaintiffs have stressed the point that TACC has de facto control over Claymax, through its option to buy Claymax's shares. Thus, by plaintiffs' own argument, the Continental shareholders' nominal interest in Claymax barely makes them owners of that corporation, let alone of TACC.

terrupted continuation of the normal business operations of the seller. *Acushnet,* 712 F.Supp. at 1015. These factors are mere indicia, however, of the ultimate issue to be decided, namely whether the parties achieved what amounts to a merger in a way which was inequitable to the seller's creditors. *Id.* at 1015. Therefore none of them is essential to a finding of liability. *Id.*

In this case, all of these factors are present to some degree. TACC/MI–CO did continue Continental's operations, at least for a period of time, through the shell Claymax. Later, while there was a consolidation of operations at TACC's Rockland facility, TACC continued to manufacture Continental's branded products, and continued to employ much of Continental's management and sales force.

The record is also clear that Continental ceased all operations as soon as the June 18, 1993 transaction was completed. While there is no indication of Continental's formal dissolution, its assetless state after the transaction would make dissolution a meaningless formality.

Finally, while TACC does not appear to have adopted in toto Continental's trade debt, there is evidence that TACC entered into an arrangement with Continental's largest customer, Duo-Fast, to discount prices to Duo–Fast to compensate for Duo–Fast's unpaid claims against Continental.

Taking all of this evidence together, and interpreting it in the light most favorable to the plaintiffs, I cannot conclude at this time that there would be insufficient evidence to support a finding of a de facto merger of Continental and TACC, were the plaintiffs able to muster additional evidence of a continuity of ownership interest between Continental and TACC.

### c. *Conclusions Regarding Successor Liability Issues*

■ For the reasons stated above, I am not prepared to allow TACC's motions for summary judgment at this time. Rather, I conclude that the plaintiffs should be allowed additional discovery, to permit them to explore more fully the true nature of the transaction between Continental and TACC/MI–CO, in order to determine whether fair consideration was paid for Continental's assets, and whether Continental's shareholders received anything amounting to an ownership interest in TACC.

Accordingly, TACC's motions for summary judgment are **DENIED** at this time, and plaintiffs' motions for a continuation of time pursuant to Rule 56(f) are **ALLOWED.** Plaintiffs are instructed to conduct whatever additional discovery they require within 90 days of the date of this order, and, if it so desires, TACC is instructed· to file its renewed motion for summary judgment within 30 days of the end of the discovery period.

### B. *Whether Judgment Should Enter in Favor of Schenectady Chemicals*

The second issue before the Court concerns the status of Schenectady Chemicals in this litigation. Schenectady was originally named as a defendant by L & W, but not by NGC. On August 3, 1994, Judge Stearns entered an order allowing Schenectady's motion to dismiss L & W's claim against it for lack of personal jurisdiction. Subsequently, Schenectady moved for entry of final judgment and L & W moved for reconsideration of Judge Stearns' order, citing new evidence from Dr. Stein's deposition. In addition, TACC, National Gypsum and Morgan Materials have all sought leave to file claims against Schenectady.

All of the proposed claims against Schenectady arise out of the same set of facts upon which L & W's original claim was based, namely Schenectady's manufacture and sale of the allegedly defective chemicals which caused yellowing of Continental's adhesive. If Judge Stearns' finding of no personal jurisdiction remains viable in light of the new evidence proffered by L & W, it applies as well to all of the claims of the other parties. Moreover, if this Court has no personal jurisdiction over Schenectady, I find, for the reasons stated below, that the entry of final judgement against Schenectady is appropriate.

### 1. *Personal Jurisdiction Over Schenectady*

In his August 3, 1994 order, Judge Stearns determined that the Massachusetts Long–

Arm Statute, M.G.L. c. 223A, § 3, conferred no personal jurisdiction over Schenectady, a New York Corporation which operates out of Schenectady, New York. In particular, Judge Stearns rejected L & W's claim that jurisdiction could be found under Section 3(a) or 3(d) of the Long–Arm Statute. Section 3(a) confers jurisdiction over a party which transacts business in Massachusetts and causes a harm thereby, while Section 3(d) confers jurisdiction when the defendant, by an action outside of Massachusetts, causes injury in the state.[19] Judge Stearns found L & W's complaint defective, since it alleged neither that Schenectady had conducted business in Massachusetts, nor that it had caused a harm therein.

L & W now contends that the deposition testimony of Dr. Stein, which was not available when Schenectady moved for dismissal, supports long-arm jurisdiction over Schenectady under Section 3(a), or under Section 3(c). Section 3(c) permits jurisdiction where the defendant commits a tort within Massachusetts. L & W's argument is not convincing.

At his deposition, Dr. Stein testified that he would not have purchased the allegedly defective chemicals from Morgan Materials, but for Morgan's statement that the chemicals had been manufactured by Schenectady. Stein also testified that he relied on a "material safety data sheet"[20] supplied by Schenectady. According to L & W, this testimony amounts to evidence that Schenectady conducted business in Massachusetts and committed a tort within the state. To the contrary, it amounts to neither.

■ The formal requirements of the Massachusetts long-arm statute must be interpreted so as to be consistent with constitutional due process requirements. *Ealing Corp. v. Harrods Ltd.*, 790 F.2d 978, 983 (1st Cir.1986). Due process requires that a defendant should not be haled into a jurisdiction "solely as a result of random, fortuitous,

or attenuated contacts." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985). Rather, jurisdiction may only be exercised when the defendant acts in some way as to "purposefully avail[ ] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* See also *Ealing Corp.*, 790 F.2d at 983. The ultimate question is whether "defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

■ L & W has proffered no evidence that Schenectady "purposefully availed itself of the privilege of conducting activities within" Massachusetts. *Burger King*, 471 U.S. at 475, 105 S.Ct. at 2183. In particular, there is no evidence that Schenectady was aware that its product would be sold in Massachusetts, nor is there any evidence as to how the Schenectady-produced chemicals came into the possession of Morgan Materials. The mere fact that the chemicals that Schenectady produced somehow found their way into Massachusetts through the actions of third parties and caused harm there is insufficient to confer personal jurisdiction over Schenectady. *See World–Wide Volkswagen*, 444 U.S. at 298, 100 S.Ct. at 567 ("the mere unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum state").

This reasoning also mitigates against allowing leave for the other parties in this action to assert claims against Schenectady. None of them, in their proposed amended pleadings, has alleged any additional jurisdictional facts which would permit this court to exercise personal jurisdiction over Schenectady.

**19.** Section 3(d) contains the additional requirement that the defendant "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered" in Massachusetts.

**20.** Manufacturers of hazardous chemicals are required by OSHA regulations to distribute material safety data sheets with their products. 29 C.F.R. § 1910.1200.

■ Leave to amend a complaint "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a); *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 59 (1st Cir. 1990). Accordingly, a district court abuses its discretion in refusing such leave unless it provides sufficient justification. *Id.* One appropriate justification for refusing leave to amend is where the proposed amendment "would be futile or would serve no legitimate purpose." *Id.* A similar standard applies to motions for leave to add third party defendants, pursuant to Rule 14. *See Kalman v. Berlyn Corp.,* 914 F.2d 1473, 1479 (Fed.Cir. 1990).

Based on the foregoing discussion, I conclude that all of the proposed claims against Schenectady would be futile, since, on any of the alleged facts, this Court would have no personal jurisdiction to hear them. Accordingly, all of the motions for leave to add claims against Schenectady are DENIED.

### 2. *Entry of Final Judgment*

Rule 54(b) of the Federal Rules of Civil Procedures provides that this Court may enter final judgment with respect to one party to an action when it determines "that there is no just reason for delay." The First Circuit has cited with approval the list of factors set forth in *Allis–Chalmers Corp. v. Philadelphia Electric Co.,* 521 F.2d 360 (3rd Cir. 1975), as a helpful guide in making this determination. *See Spiegel v. Trustees of Tufts College,* 843 F.2d 38, 43, n. 3 (1st Cir.1988).

In *Allis–Chalmers,* the Third Circuit identified the following factors to consider:

(1) the relationship between the adjudicated and the unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency consider-

ations, shortening the time of trial, frivolity of competing claims, expense, and the like. 521 F.2d at 364 (footnotes omitted).

■ Applying these factors here, I find that there is no just reason to delay entry of judgment in favor of Schenectady. Because the claims against Schenectady were dismissed, there is no issue of set-offs against the judgment. Moreover, entry of judgment now creates no danger that the Court of Appeals will have to consider the same issue twice, since the claims were dismissed for lack of personal jurisdiction, an issue which is not present in any of the remaining claims. Finally, entry of judgment now will facilitate the rapid prosecution of any appeal so that if this Court's dismissal is reversed, the claims against Schenectady are more likely to be resolved in the same time frame as the claims against the other defendants in this action, thus avoiding the likelihood that defendants will be required to pay judgments against which they are owed a set-off.

For all the foregoing reasons, Schenectady's motion for entry of final judgment is **ALLOWED,** and the Clerk is ordered to enter a judgment dismissing L & W's claims against Schenectady without prejudice.

### C. *Whether NGC and TACC Should Be Allowed Leave to Add Claims Against Morgan Materials*

■ NGC seeks leave to amend its complaint to add claims against Morgan Materials, while TACC seeks leave file a third-party complaint against Morgan in No. 93–12027, and a cross-claim against Morgan in No. 93–10147. All of these claims relate to Morgan's alleged liability for the damage caused by the yellowing adhesive. Morgan has opposed TACC's motion on the ground that there is no evidence to support plaintiffs' claims against TACC and, accordingly, no basis for TACC to seek contribution or indemnity from Morgan.

Morgan's opposition is meritless. The issue of TACC's liability in this action is still an open one. In the event that TACC is held liable for plaintiff's claims, TACC, as successor to Continental, would have a colorable claim for contribution or indemnity against

Morgan. The issues relating to TACC and NGC's claims against Morgan are likely to be largely the same as those concerning the claims against Morgan by L & W. Concerns of judicial economy therefore mitigate in favor of resolving all of these claims together. Since the discovery in this action to date has been quite preliminary, and has been limited to jurisdictional and successorship issues, Morgan is unlikely to be prejudiced as a result of the interposition of these additional claims.

Accordingly, NGC's motion to amend its complaint to add claims against Morgan is **ALLOWED** and TACC's motion to add cross-claims and third-party claims against Morgan is also **ALLOWED**.[21]

### D. *Whether Morgan Materials is Entitled to Additional Discovery from L & W*

The final issue to be resolved concerns a motion by Morgan Materials to compel further answers by L & W to interrogatories. Morgan served L & W with a set of interrogatories on January 11, 1994. L & W did not respond until December, 1994 because, it claims, it needed information from Dr. Stein relating to his dealings with Morgan. L & W claims that Dr. Stein's deposition was delayed because lack of cooperation by Continental's counsel.

In any event, L & W served Morgan with its answers prior to Dr. Stein's deposition. On January 6, 1995, after the deposition, L & W's counsel wrote to Morgan's counsel providing supplemental answers to Morgan's interrogatories. Morgan contends that L & W's answers are not responsive to the questions which it propounded. In the light of the Court's rulings it is likely that all parties will have the benefit of more information as a result of my extending discovery to the issues addressed above. One would assume that that discovery will enable L & W to further supplement its answers to the satisfaction of Morgan Materials or, perhaps, obviate the need for the information requested

in Morgan's Material's requests. Accordingly, this motion is **DEFERRED**.

### IV. CONCLUSION

For the foregoing reasons, TACC's motions for summary judgment are **DENIED** and plaintiffs' motions for a continuation of time pursuant to Rule 56(f) are **ALLOWED**. TACC, Morgan and NGC's motions for leave to file claims against Schenectady are **DENIED**. Schenectady's motion for entry of final judgment is **ALLOWED**. NGC and TACC's motions for leave to file claims against Morgan are **ALLOWED**. Morgan's motion to compel further answers to interrogatories is **DEFERRED**.

In furtherance of the the the Court's allowance of plaintiffs' Rule 56(f) motions, plaintiffs are instructed to conduct whatever additional discovery they require within 90 days of the date of this order. TACC may file a renewed motion for summary judgment within 30 days of the end of this discovery period.

### SO ORDERED.

### ORDER

For the reasons stated in the accompanying Memorandum and Order, the motions currently before me are disposed of as follows:

1) TACC International Corporation's (TACC) motion for summary judgment against National Gypsum Company (NGC) in 93–12027 (# 32) is **DENIED**.

2) Schenectady Chemicals, Inc.'s (Schenectady) motion for entry of final judgment in No. 93–12147 (# 47) is **ALLOWED**.

3) Morgan Materials, Inc.'s (Morgan) motion to compel further answers to interrogatories by L & W in No. 93–12147 (# 55) is **DEFERRED**.

4) TACC's motion for leave to file cross-claims against defendant Schenectady and Morgan in No. 93–12147 and to file third party claims against Schenectady and Morgan in No. 93–12027 (# 61) is **ALLOWED**

---

21. Because both NGC and TACC submitted proposed pleadings containing claims against both Schenectady and Morgan, and because I have denied leave to add the claims against Schenec-

tady, NGC and TACC are directed to file appropriate pleadings which do not contain claims against Schenectady.

with respect to Morgan and **DENIED** with respect to Schenectady.

5) NGC's motion for leave to take depositions pursuant to Rule 56(f) in No. 93–12027 (# 66) is **ALLOWED.**

6) Morgan's motion for leave to file cross claims against Schenectady in No. 93–12147 (# 73) is **DENIED.**

7) L & W's motion pursuant to Rule 56(f) in No. 93–12147 (# 71) is **ALLOWED.**

8) NGC's motion to amend the complaint in No. 93–12027 (# 76) is **ALLOWED** with respect to claims against Morgan and **DE-NIED** with respect to claims against Schenectady.

**SO ORDERED.**